# TIDE WATER OIL COMPANY *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 149. Argued April 29, 1898. — Decided May 31, 1898.

The court of claims made the following findings of fact in this case. I. During the years 1889, 1890 and 1891 the claimant was a corporation existing under the laws of New Jersey, organized in 1888, and having a factory for carrying on its business at Bayonne, in that State. II. In 1889 and 1890 the claimant imported from Canada box shooks, and from Europe steel rods, upon which importation duties amounting in the aggregate to $39,636.20 were paid to the United States, of which sum $837.68 was paid on the importation of the steel rods. III. The box shooks imported as set forth in finding II were manufactured in Canada from boards, first being planed and then cut into required lengths and widths, intended to be substantially correct for making into boxes without further labor than nailing the shooks together. They were then tied up in bundles of sides, of ends, of bottoms, and of tops of from fifteen to twenty-five in a bundle for convenience in handling and shipping. IV. The shooks so manufactured in Canada and imported into the United States as aforesaid were, at the claimant's factory in Bayonne, New Jersey, constructed into the boxes or cases set forth in Exhibit E to the

petition herein, by nailing the same together with nails manufactured in the United States out of the steel rods imported as aforesaid, and by trimming when defective in length or width to make the boxes or cases without projecting parts, *i.e.*: the shooks were imported in bundles of ends, of sides, of tops and of bottoms, each part coming in bundles separated from the bundles of other parts. From one of these bundles of ends the ends of a box are selected, to which the sides taken indiscriminately from any bundle of sides are nailed by nailing machines; then the sides are trimmed off even with the ends by saws; then by bottoming machines bottoms taken from any bundle of bottoms are nailed on; then the bottoms are trimmed even with the sides by saws; then, after being filled with cans, the tops are nailed on; and then the boxes or cases are ready for exportation. The cost of the labor expended in the United States in the necessary handling and in the nailing and trimming of the boxes as aforesaid was equal to about one tenth of the value of the boxes. The principal part of the labor performed in trimming the boxes was occasioned by the Canadian manufacturer not cutting the shooks into the required lengths and widths for use in making the boxes, and for which the claimants sometimes charged the cost of such trimming to the Canadian manufacturer. *Held*, that the company, when exporting these manufactured boxes, was not entitled to be allowed a drawback under Rev. Stat. §3019.

THIS was a petition by a corporation of New Jersey for a drawback of duties paid upon certain shooks imported from Canada, and iron rods imported from Europe, which were manufactured into boxes or cases by the petitioner in its factory at Bayonne, New Jersey, and were subsequently exported to foreign countries.

The Court of Claims made the following findings of fact:

"1. During the years 1889, 1890 and 1891 the claimant was a corporation existing under the laws of New Jersey, organized in 1888, and having a factory for carrying on its business at Bayonne, in that State.

"2. In 1889 and 1890 the claimant imported from Canada box shooks, and from Europe steel rods, upon which importation duties amounting in the aggregate to $39,636.20 were paid to the United States, of which sum $837.68 was paid on the importation of the steel rods.

"3. The box shooks imported as set forth in finding 2 were manufactured in Canada from boards, first being planed and then cut into required lengths and widths, intended to be sub-

stantially correct for making into boxes without further labor than nailing the shooks together. They were then tied up in bundles of sides, of ends, of bottoms and of tops of from fifteen to twenty-five in a bundle for convenience in handling and shipping.

"4. The shooks so manufactured in Canada and imported into the United States as aforesaid were, at the claimant's factory in Bayonne, N. J., constructed into the boxes or cases set forth in Exhibit E to the petition herein, by nailing the same together with nails manufactured in the United States out of the steel rods imported as aforesaid, and by trimming when defective in length or width to make the boxes or cases without projecting parts, i.e.: the shooks were imported in bundles of ends, of sides, of tops and of bottoms, each part coming in bundles separated from the bundles of other parts. From one of these bundles of ends the ends of a box are selected, to which the sides taken indiscriminately from any bundle of sides are nailed by nailing machines; then the sides are trimmed off even with the ends by saws; then by bottoming machines bottoms taken from any bundle of bottoms are nailed on; then the bottoms are trimmed even with the sides by saws; then, after being filled with cans, the tops are nailed on; and then the boxes or cases are ready for exportation.

"The cost of the labor expended in the United States in the necessary handling and in the nailing and trimming of the boxes as aforesaid was equal to about one tenth of the value of the boxes.

"The principal part of the labor performed in trimming the boxes was occasioned by the Canadian manufacturer not cutting the shooks into the required lengths and widths for use in making the boxes, and for which the claimants sometimes charged the cost of such trimming to the Canadian manufacturer.

"5. The boxes or cases made as aforesaid were exported from the United States to foreign countries in conformity with the regulations of the Treasury Department then in force, to wit, Treasury regulations of 1884, sections 966, 967 and 968, hereinafter set out, relating to drawbacks upon the exporta-

tion of articles wholly manufactured of imported materials, and cases so manufactured were entered for such drawback upon the exportation thereof.

"6. For about four years prior to July 31, 1889, the Treasury Department had allowed and paid a drawback upon the exportation of boxes made from imported shooks fastened together with nails made from imported steel rods as aforesaid; and the Treasury Department was requested to pay the drawback on the exportation of the boxes or cases set forth in Exhibit E to the petition, but refused for the reasons set forth in the following communication addressed to the collector of customs at New York:

"'TREASURY DEPARTMENT, *July* 31, 1889.

"'SIR: Referring to department letter of March 2, 1885, addressed to the then collector at your port, in which a rate of drawback was established on shooks used in the manufacture of boxes, you are informed that the department has recently given the matter further consideration, and it appears upon investigation that the boxes are made complete in Canada, with the exception of nailing, and that the only manufacture which they receive in this country consists in their thus being nailed together, which part of the labor is omitted to be done in Canada merely for convenience in shipping to the United States.

"'The boxes appear to have been manufactured complete abroad, and in the condition imported resemble the finished furniture imported in pieces which the department has heretofore held to be dutiable at the rate applicable to finished furniture. (See Synopsis, 4272.)

"'The simple act of nailing them together is not, in the opinion of the department, a manufacture within the meaning of section 3019, Revised Statutes, and the authority to allow drawback thereon is hereby revoked.

"'You will accordingly receive no further entries for drawback in such cases.

"'Respectfully yours,     GEORGE C. TICHNOR,
"'*Assistant Secretary.*

"'Collector of Customs, New York.'

" 7. The Treasury regulations of 1884 referred to in finding 5, viz., articles 966, 967 and 968, are as follows :.

" ' ART. 966. On articles wholly manufactured of imported materials on which duties have been paid, a drawback is to be allowed, on exportation, equal in amount to the duty paid on such imported materials, less 10 per cent thereof, except on exportations of refined sugars, in which case the legal retention is 1 per cent.

" ' ART. 967. The entry in such cases will be as follows, and must be filed with the collector at least six hours before putting or lading any of the merchandise on board the vessel or other conveyance for exportation.' "

Here follows a form of entry for exportation with oaths of exporter and of the proprietor and foreman of manufactory.

Article 968 contained a form of bond for exportation.

Upon the foregoing findings the court found the ultimate fact, so far as it was a question of fact, that the boxes or cases so exported were not manufactured in the United States, and, as a conclusion of law, that the claimant was not entitled to recover; and the petition was dismissed. Whereupon petitioner appealed to this court.

*Mr. Edwin B. Smith* for appellant.

*Mr. Assistant Attorney General Hoyt* for appellees. *Mr. Felix Brannigan* was on his brief.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

The single question presented for our consideration in this case is whether the boxes or cases exported by the petitioner were " wholly manufactured " in the United States within the meaning of the section hereinafter cited.

The facts were, in substance, that the claimant imported from Canada in 1889 and 1890 box shooks, and from Europe steel rods, upon which duties were paid to the amount of $39,636.20 under the tariff act of March 3, 1883, 22 Stat. 488, 502, which levied a duty of thirty per cent upon " casks and

barrels, empty sugar-box shooks, and packing boxes, and packing-box shooks, of wood, not specially enumerated or provided for in this act." The box shooks so imported were manufactured in Canada from boards, which were planed and cut into the required lengths and widths for making into boxes without further labor than nailing them together. They were then tied up into bundles of sides, ends, bottoms and tops, of from fifteen to twenty-five in a bundle, for convenience in handling and shipping. After importation, they were made up into boxes or cases, by nailing the proper parts together with nails manufactured in the United States out of the imported steel rods, and by trimming, when defective in length or width, to make the boxes or cases without projecting parts.

The ends and sides of the boxes were nailed together by nailing machines, and the sides trimmed off even with the ends by saws. Then bottoms were nailed on and trimmed in the same manner. After being filled, the tops were nailed on, and the boxes made ready for exportation. The cost of the labor expended in the United States in the nailing, handling and trimming of the boxes was about one tenth of the value of the boxes. The principal part of the labor in trimming the boxes was occasioned by the Canadian manufacturer not cutting the shooks into the required lengths and widths for making the boxes, the cost of which trimming the claimant sometimes charged to the Canadian manufacturer.

Upon this state of facts petitioner made claim for duties paid as above upon the shooks under Rev. Stat. § 3019, which reads as follows:

"There shall be allowed on all articles wholly manufactured of materials imported, on which duties have been paid when exported, a drawback equal in amount to the duty paid on such materials, and no more, to be ascertained under such regulations as shall be prescribed by the Secretary of the Treasury. Ten per centum on the amount of all drawbacks so allowed shall, however, be retained for the use of the United States by the collectors paying such drawbacks respectively."

The question arises whether the boxes in question were

" wholly manufactured" within the United States of "materials imported" from abroad. The section above quoted uses the words " wholly manufactured of materials imported," but we understand it to be conceded that the words "in the United States" should be considered as being incorporated into the section after the word "manufactured." The provision would be senseless without this interpolation. The object of the section was evidently not only to build up an export trade, but to encourage manufactures in this country, where such manufactures are intended for exportation, by granting a rebate of duties upon the raw or prepared materials imported, and thus enabling the manufacturer to compete in foreign markets with the same articles manufactured in other countries. In determining whether the articles in question were wholly manufactured in the United States, this object should be borne steadily in mind.

The primary meaning of the word "manufacture" is something made by hand, as distinguished from a natural growth; but as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.

The material of which each manufacture is formed, and to which reference is made in section 3019, is not necessarily the

original raw material — in this case the tree or log — but the product of a prior manufacture; the finished product of one manufacture thus becoming the material of the next in rank. This case, then, resolves itself into the question whether the materials out of which these boxes were constructed were the boards which were manufactured in Canada or the shooks which were imported into the United States.

While the planing and cutting of the boards in Canada into the requisite lengths and shapes for the sides, ends, tops and bottoms of the boxes, was doubtless a partial manufacture, it was not a complete one, since the boards so cut are not adaptable as material for other and different objects of manufacture, but were designed and appropriate only for a particular purpose, *i.e.*, for the manufacture of boxes of a prescribed size, and were useless for any other purpose. It is not always easy to determine the difference between a complete and a partial manufacture, but we may say generally that an article which can only be used for a particular purpose, in which the process of manufacture stops short of the completed article, can only be said to be partially manufactured within the meaning of this section; nor can we regard the mere assembling and nailing together of parts complete in themselves and destined for a particular purpose as a complete and separate manufacture. Thus, chairs are made of bottoms, backs, legs and rounds, each one of these parts being made separately and in large quantities. If imported in this condition from abroad, and the parts were assembled and glued or screwed together here, we think it entirely clear that such chairs would not be wholly manufactured in the United States; and the same may be said of the staves, heads and hoops which constitute a barrel. Upon the theory of the claimant, if all the parts which constitute a wooden house were made separately, as they sometimes are, and imported from abroad and put together in this country in the form of a house, it would follow that the house must be said to have been wholly constructed in this country.

It may be said generally, although not universally, that a complete manufacture is either the ultimate product of prior

successive manufactures, such as a watch spring, or a penknife, or an intermediate product which may be used for different purposes, such for instance as pig iron, iron bars, lumber or cloth ; while a partial manufacture is a mere stage in the development of the material toward an ultimate and predestined product, such for instance as the different parts of a watch which need only to be put together to make the finished article. If, for instance, the wheels, chain, springs, dial, hands and case of a watch were all imported from abroad, and merely put together in this country, we do not think it could be said that the watch was wholly manufactured within the United States. The same remark we think may be made with reference to the shooks in this case, which were practically worthless except for being put together for a box of a definite size.

The distinction here made was alluded to in the opinion of this court in *Worthington* v. *Robbins*, 139 U. S. 337, 341, in which the question arose whether "white hard enamel," used for various purposes, including watch dials, was dutiable as "watch materials," or as a simple manufacture. In delivering the opinion of the court Mr. Justice Blatchford said: "The article in question was, to all intents and purposes, raw material. If it were to be classed as 'watch materials,' it would follow that any metal which could ultimately be used, and was ultimately used, in the manufacture of a watch, but could be used for other purposes also, would be dutiable as 'watch materials.' In order to be 'watch materials' the article must in itself bear marks of its special adaptation for use in making watches. The fact that the article in question was used in the manufacture of watches has no relation to the condition of the article as imported, but to what afterwards the importer did with it."

It does not necessarily follow that the shooks in question were not a manufacture, and dutiable as such, or that they were dutiable as boxes, though destined to be put together as such, since in *United States* v. *Schoverling*, 146 U. S. 76, finished gunstocks with locks and mountings, unaccompanied by barrels, were held to be dutiable as manufactures of iron, and not as "guns."

Bearing in mind that the object of the drawback was partly, at least, to encourage domestic manufactures, and that all the substantial work done in this country was in nailing together the tops, bottoms and sides of these boxes, we think it clear that it cannot be said that the boxes so constructed were wholly manufactured in the United States. The work done in trimming or sawing off the ends of the boards was a mere incident to the nailing together, and was caused by the inadvertence, negligence or insufficient instructions given to the Canadian manufacturer, and was no proper part of the manufacture. While the amount of work done to constitute a new manufacture may not be great, *Saltonstall* v. *Wiebusch*, 156 U. S. 601, yet we think the fact that in the transfer of those boards to the completed boxes, the cost of labor expended in the United States represented only one tenth in value of the boxes is important, especially when taken in connection with the fact that the shooks when imported were usable only for a single purpose. It is quite improbable that Congress intended to allow a drawback upon the nine tenths represented by the Canadian material for the benefit of the one tenth represented by the labor put upon the boxes in this country. What was doubtless meant was to allow this drawback upon articles manufactured wholly and *bona fide* within the United States, either from the raw material, or from material which was the result of the last complete manufacture.

While the nails, which were used in fastening the shooks together and were made from iron rods imported from abroad, may be said to have been wholly manufactured in the United States within the principles here announced, they lost their identity as such when used in nailing the shooks together, and became so far a part of the boxes that no separate drawback could be claimed for them.

There was no error in dismissing the petition, and the judgment of the Court of Claims is therefore

*Affirmed.*