### UNITED STATES v. F. W. MYERS & CO.

(Circuit Court, N. D. New York. June 8, 1905.)

CUSTOMS DUTIES — CLASSIFICATION—FIREPROOFED LUMBER—MANUFACTURES OF WOOD.

As to so-called fireproofed lumber, produced by subjecting ordinary sawed lumber to an expensive fireproofing process, which, without producing any particularly noticeable change in the appearance of the lumber, fits it for purposes for which it would not otherwise be suitable, *held*, that as it becomes a new article, with changed character, qualities, and uses, it is no longer within the provision for "sawed lumber" in Tariff Act July 24, 1897, c. 11, § 1, Schedule D, par. 195, 30 Stat. 167 [U. S. Comp. St. 1901, p. 1646], but becomes a "manufacture of wood," as enumerated in paragraph 208, 30 Stat. 168 [U. S. Comp. St. 1901, p. 1647].

On Application for Review, of a Decision of the Board of United States General Appraisers.

This is an appeal by the government from the decision of the Board of General Appraisers of the United States (G. A. 5,827, T. D. 25,715) reversing the action of the collector of customs at the port of Champlain, New York, as to the duties on certain so-called fireproofed lumber imported into the United States.

Geo. B. Curtiss, U. S. Atty.

Comstock & Washburn (Albert H. Washburn, of counsel), for importer.

RAY, District Judge. The material in question is known as "fireproofed lumber," and is the result of subjecting ordinary sawed lumber, at an expense of about $19 per thousand feet, to the following process:

"The lumber is placed in cars, and then run into cylinders about 110 feet in length and 6 to 7 feet in diameter. The doors are closed, and the cylinders made air-tight. Steam is then turned on for the purpose of softening the lumber and opening its pores. Next the vacuum is applied, and the sap withdrawn from the lumber. Then, under pressure, a solution consisting of sulphate and phosphate of ammonia is injected into the fiber of the wood. The cars are then withdrawn from the cylinders, and the lumber permitted to become air-dried, after which the cars are placed in kilns, and the lumber dried by gradual heat until it is perfectly dry."

This process does not produce any material or particularly noticeable change in the appearance of the lumber. It has a slightly better finish. It must be conceded, however, that by means of labor expended thereon, and material applied thereto and incorporated therein, its composition is changed, and it is fitted for uses and purposes to which the lumber not so treated would not and could not be, or at least ought not to be, used. The lumber before treatment was highly combustible; after treatment, is fireproof. Before treatment it was pine, hemlock, ash, etc., lumber, as the case may have been; after treatment, it is "fireproofed lumber." Before treatment it was worth, say, $20 or $40 per thousand feet, while after treatment it is worth $39 or $59 per thousand feet. The difference in value represents added labor and material. The added material is there—remains with the "fireproofed lumber" as a part of it, and fits and adapts the material to new uses in new places—but does not change the appearance, except to the professional eye of the chemical expert. The sap has been withdrawn, with all its constituent parts, and another material has been added— a material not found in lumber unless placed there by the hand of labor—and when so added it does not change, but remains in the fibers of the wood. The process, however, does not in any degree unfit or destroy the lumber for use in every place, mode, and manner such lumber is used when not subjected to the process of "fireproofing." Its form "workability" is not changed in the least. But its cost in its new character would prohibit its use as ordinary lumber. The Board of General Appraisers, overruling the collector, held that the merchandise in question is "sawed lumber not spe-

cially provided for," and dutiable at $2 per thousand feet, board measure, under paragraph 195, Tariff Act July 24, 1897, c. 11, § 1, Schedule D, 30 Stat. 167 [U. S. Comp. St. 1901, p. 1646]. The contention is the finding or holding should have been that such merchandise is "a manufacture of wood not specially provided for," and dutiable as such at the rate of 35 per cent. ad valorem, under paragraph 208 of that act.

Chapter 11, Laws 1897, approved July 24, 1897, being "An act to provide revenue for the government and to encourage the industries of the United States," is divided into schedules, each schedule treating of a different class of merchandise. Schedule A treats of "chemicals, oils and paints"; Schedule B, of "earths, earthenware and glass-ware"; Schedule C, of "metals and manufactures of"; and Schedule D, of "wood and manufactures of." 30 Stat. 151, 155, 159, 167 [U. S. Comp. St. 1901, pp. 1626, 1632, 1636, 1646]. Each schedule has subdivisions and subheads, as, for instance in Schedule C, iron ore, etc., wire, general provisions; then manufactures of iron and steel, cutlery, firearms, spikes, tacks, needles, plates, saws, miscellaneous metals and manufactures of, gold and silver, lead. But these subheads are not safe guides as to what may be found thereunder, as, for instance, under the subhead "Lead" we find metallic mineral substances, mica, nickel pens, quicksilver, watch movements, etc. Hence these subheadings furnish no guide whatever as to what is to be regarded "genus," and what "species." Schedule D has no subheading. Paragraph 194 refers to "timber" hewn, sided, or squared, not less than eight inches square, and round timber used for spars and wharves. Paragraph 196 refers, first, to sawed boards, planks, deals, and other lumber of white-wood, sycamore, and basswood, and imposes a duty thereon of $1 per thousand feet, board measure; and, second, to all other kinds of sawed lumber, such as hemlock, pine, spruce, beech, birch, maple, etc., excepting "cabinet woods," of which specimens are named in subdivision 198, and imposes a duty thereon of $2 per thousand feet, board measure. It is evident that it was not intended to regard sawed lumber or boards of any description as a manufacture of wood, even when labor additional to the sawing has been expended thereon, for it is expressly provided (subdivision 195) that "when lumber of any sort [this includes all sorts of boards] is planed or finished, in addition to the rates herein provided, there shall be levied and paid for each side so planed or finished fifty cents per thousand feet board measure; and if planed on one side and tongued and grooved, one dollar per thousand feet board measure; and if planed on two sides and tongued and grooved, one dollar and fifty cents per thousand feet board measure"; and in subdivision 198 it is said "Sawed boards * * * not further manufactured than sawed fifteen per centum ad valorem. * * *" It is evident that, in giving construction to this act, sawed lumber is to be regarded as partly manufactured, but not as "a manufacture of wood." It is also evident that the provisions of subdivision 195, just quoted, were put in the act to meet the decision of the Supreme Court of the United States in United States v. Dudley, 174 U. S. 670, 19 Sup.

Ct. 801, 43 L. Ed. 1129. Paragraph 208 of the tariff act of 1897 (30 Stat. 168 [U. S. Comp. St. 1901, p. 1647]) reads the same as paragraph 181 of the tariff act of August 28, 1894 (chapter 349, 28 Stat. 509), except it increases the duty from 25 to 35 per centum ad valorem. Paragraph 208 reads:

"House or cabinet furniture of wood, wholly or partly finished and manufactures of wood, or of which wood is the component material of chief value not specially provided for in this act, thirty-five per centum ad valorem."

In the Dudley Case, supra, the court held:

"Sawed boards and plank, planed on one side and grooved, or tongued and grooved, should be classified under the tariff act of August 28, 1894, c. 349, 28 Stat. 509, as dressed lumber, and admitted free of duty."

And the court said:

"In other words, a new manufacture is usually accompanied by a change of name, but a change of name does not always indicate a new manufacture. Where a manufactured article, such as sawed lumber, is usable for a dozen different purposes, it does not ordinarily become a new manufacture until reduced to a condition where it is used for one thing only. So long as 'dressed lumber' is in a condition for use for house and shipbuilding purposes generally, it is still 'dressed lumber'; but if its manufacture has so far advanced that it can only be used for a definite purpose, as sashes, blinds, moldings, spars, boxes, furniture, etc., it becomes a 'manufacture of wood.' It follows that the words 'flooring, ceiling, sheathing,' do not under this act describe a new manufacture, but rather the different purposes for which sawed lumber may be used. It is much like the commercial division of lumber into 'selects, common and culls,' which are all lumber, but of different qualities. None of these are in reality new names, but merely specifications of the more general term 'lumber.' * * * It is true that the lumber in question was in a condition to be used for flooring without further manufacture, except such reductions in length as the dimensions of the room might require; but it was also usable for ceiling, sheathing, and for similar purposes, with no further alterations. Had it so far been changed as to be serviceable for only one thing, it is possible that it might be regarded as a separate and independent manufacture, though, under the case of Tide Water Oil Co. v. United States, 171 U. S. 210, 18 Sup. Ct. 837, 43 L. Ed. 139, this may admit of some doubt. But while lumber planed upon one or both sides may be 'dressed lumber,' we think that when tongued and grooved it is still 'dressed lumber,' and not a new and distinct manufacture; in other words, that tonguing and grooving is an additional dressing, but it does not make it a different article. Lumber treated in this way is still known in the trade as lumber, advertised as lumber, handled as lumber, shipped as lumber, bought and sold by the thousand feet like lumber. We also think that some light upon the proper construction of the words 'manufacture of wood,' in paragraph 181, is afforded by the fact that it is used in connection with 'house or cabinet furniture of wood, wholly or partly finished,' and is followed by the words, 'or of which wood is the component material of chief value.' This would indicate an article 'made up' of wood, analogous to furniture or other article in which wood is used alone or in connection with some other material. It seems to us quite clear that it could not have been intended to apply to lumber which had only passed beyond the stage of planed lumber by being tongued and grooved."

This would seem to settle the question that "fireproofed lumber" cannot be held to be a manufacture of wood, or a manufacture "of which wood is the component material of chief value," for the reason it is wood upon which labor has been performed. In no respect and in no sense has it been so changed physically that it cannot be used for every purpose to which it was applied before being fireproofed. But United States v. Dudley, supra, does not

go at all to the question of the wide change in the quality or characteristics of the lumber. "Fireproofed lumber" is not what it was before being subjected to the operation or process in which it received the additions before described, and during which process its qualities, by reason of additions and subtractions not visible to the naked eye, but easily found when subjected to chemical analysis or when put to use, were materially changed—so much so that it has become too costly for its old or prior uses, unless a fireproof structure or article is desired, and adapted to new uses, and is put in a condition in which it has lost some of its old qualities and taken on new ones. "Fireproofed lumber" is a new article made out of sawed lumber or boards of any kind of wood and sulphate and phosphate of ammonia. It is clearly a manufacture, for it is made of lumber or sawed lumber, or boards or wood—it may be wood in any one of a dozen different forms, each form bearing a different name—from which lumber or wood something, viz., the sap, has been taken during the process of manufacture, and to which sulphate and phosphate of ammonia, not found in wood or lumber of any kind except this new "manufacture," during such process of manufacture have been added. It is clear that "fireproofed lumber" is "a manufacture." It is no longer "lumber" or "sawed lumber" or "timber" or "wood." It is a new article of manufacture, "fireproofed lumber," having a new character, new qualities, and its special uses to which it is specially adapted— uses to which no other wood, in any form, can be put. It is no answer to say the new article can be used as was the wood or timber used in making it. If gold and silver are mixed together in such a way that we have a new combination that may be put to a use neither could be alone, and the new combination is the result of a process, and a name is given to such combination, is it deprived of its right to be called a manufacture of metals for the reason that, so far as its mechanical uses are concerned, the new combination may be employed for all the uses to which gold was or may be put?

A "manufacture" is "anything made from raw materials by the hand, by machinery or by art, as cloths, iron utensils, shoes, machinery, saddlery, etc." See Webster's Dictionary. See, also, Worcester's Dictionary; Brandes Enc.; Tide Water Oil Co. v. United States, 171 U. S. 210, 18 Sup. Ct. 837, 43 L. Ed. 139; United States v. Schoverling, 146 U. S. 76, 13 Sup. Ct. 24, 36 L. Ed. 893.

In United States v. Schoverling, supra, finished gunstocks, with locks and mountings unaccompanied by barrels, were held dutiable as manufactures of iron.

. In Tide Water Oil Co. v. United States, supra, the court said:

"The primary meaning of the word 'manufacture' is something made by hand, as distinguished from a natural growth; but, as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily the article so manufactured takes a different form, or at least subserves a different purpose, from the original materials, and usually it is given a different name. Raw materials may be, and often are, subjected to successive processes of manufacture, each one of which is

complete in itself, but several of which may be required to make the final product. Thus logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name. The material of which each manufacture is formed, and to which reference is made in section 3019 [U. S. Comp. St. 1901, p. 1990], is not necessarily the original raw material—in this case the tree or log—but the product of a prior manufacture; the finished product of one manufacture thus becoming the material of the next in rank. * * * It may be said generally, although not universally, that a complete manufacture is either the ultimate product of prior successive manufactures, such as a watch spring, or a penknife, or an intermediate product which may be used for different purposes, such, for instance, as pig iron, iron bars, lumber, or cloth, while a partial manufacture is a mere stage in the development of the material toward an ultimate and predestined product, such, for instance, as the different parts of a watch, which need only to be put together to make the finished article. * * * While the nails, which were used in fastening the shooks together, and were made from iron rods imported from abroad, may be said to have been wholly manufactured in the United States, within the principles here announced, they lost their identity as such when used in nailing the shooks together, and became so far a part of the boxes that no separate drawback could be claimed for them."

It seems clear that "fireproofed lumber" is something, and a new thing, and that it is made from raw materials—wood, sawed wood, or split wood, or boards or timber, it may be, and sulphate and phosphate of ammonia. That it is made by the work of the human hands and machinery and art working together cannot be questioned. The result of the combination is "fireproofed lumber." But is it a manufacture of which wood is the component material of chief value? If we are to construe the act as meaning that the wood in the product must have cost more in dollars and cents, or have been of greater value in dollars and cents, than the other ingredients or component materials in all cases, it is somewhat doubtful whether "fireproofed lumber" is a manufacture of wood, as defined in paragraph 208; that is, "a manufacture of which wood is the component material of chief value." This court is of the opinion that a reasonable and practical construction is to be given to paragraph 208, and that wood must be a component material and of chief or most important value or utility in the manufactured article or product. It is not necessary, in order to come within paragraph 208, that in making basswood boards into "fireproofed lumber" the boards shall have cost more in the foreign country than the phosphate and sulphate used in the manufacture of the finished product, dividing the cost of the labor equally. It is evident that in all cases the main thing is the lumber. That is the component material of greatest value or utility in the making of "fireproofed lumber," and in most instances its value in dollars and cents would be the greater at the commencement of the manufacturing process. It is perhaps well to remark that I have considered every point raised by the importer, but it would not be profitable to discuss them all here. It is true that in most instances all the materials used in creating a manufactured article change their form, but that is not

always the case. This is one of those cases. The sulphates and phosphates disappear from sight and change their form in the wood, while the wood apparently is not changed in appearance. To make "fireproofed lumber," sawed lumber is changed in name,. and in character and to an extent in use. In some directions its use is much more limited, and in others more extended. In the case under consideration the white pine was, with the phosphates. and sulphates, manufactured into "fireproofed lumber," and in fact the white pine was the component material of chief pecuniary value at every stage.

The decision of the Board of General Appraisers is reversed, and that of the collector is affirmed.