CARBON STEEL CO. v. LEWELLYN, Collector of Internal Revenue. WORTH BROS. CO. v. LEDERER, Collector of Internal Revenue. LEWELLYN, Collector of Internal Revenue, v. FORGED STEEL WHEEL CO. * *

(Circuit Court of Appeals, Third Circuit. June 9, 1919.)

Nos. 2438, 2465, 2462.

1. INTERNAL REVENUE ☞4—STATUTE—CONSTRUCTION—PURPOSE.

In construing Act Sept. 8, 1916, tit. 3, § 301 (Comp. St. § 6336⅛b), the court must put himself in the position of Congress when it enacted the law, and from the circumstances and surroundings then existing, and the general purpose then in view, ascertain what was meant to be done.

2. INTERNAL REVENUE ☞11—TAXATION OF AMMUNITION MANUFACTURERS.

The broad general purpose of Act Sept. 8, 1916, was to include in the field of taxation all such specified articles or parts thereof as were either made for war purposes, or were withdrawn from the general field of commerce and used for the making of war articles.

3. INTERNAL REVENUE ☞9—"MANUFACTURING SHELLS"—PERSONS SUBJECT TO TAX—"MAKING."

A steel company, contracting to deliver shells to a foreign government, which manufactured in its own plant bars for which shells were made, and turned them over to subcontractors for completion. retaining ownership and control of the work, and afterwards delivering shells under its contract, realizing a net profit, was "manufacturing shells." and therefore subject to the tax imposed by Act Sept. 8, 1916, "making" being manufacturing.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Making.]

4. INTERNAL REVENUE ☞9—"A PERSON MANUFACTURING SHELLS * * * OR ANY PART OF ANY OF THE ARTICLES MENTIONED."

A company which contracted with another company, having a contract with a foreign government, to sell and deliver high explosive shells, to furnish the steel, and complete six of the initial steps, representing about 40 per cent. of cost of shells, held "a person manufacturing * * * shells * * * or any part of any of the articles mentioned," and to be subject to the tax imposed by Act Sept. 8, 1916.

5. INTERNAL REVENUE ☞9—MANUFACTURING MUNITIONS—"A PERSON MANUFACTURING SHELLS * * * OR ANY PART."

A subcontractor which agreed with contractor, having contract with a foreign government to supply high explosive shells, to furnish to contractor rough steel shell forgings, and which to fulfill its contract made, had made, or bought in the market steel required, held "a person manufacturing * * * shells * * * or any part," thereof and to be subject to the tax imposed by Act Sept. 8, 1916.

No. 2438:

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

No. 2465:

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Certiorari granted 250 U. S. —, 40 Sup. Ct. 15, 64 L. Ed. —.

In Error to the District Court of the United States for the Eastern District of Pennsylvania; J. Whitaker Thompson, Judge.

No. 2462:

In Error to the District Court of the United States for the Western District of Pennsylvania; W. H. Seward Thomson, Judge.

Actions by the Carbon Steel Company against C. G. Lewellyn, Collector of Internal Revenue for the Twenty-Seventh District of Pennsylvania, by the Worth Bros. Company against E. Lederer, Collector of Internal Revenue for the First District of Pennsylvania, and by the Forged Steel Wheel Company against C. G. Lewellyn, Collector of Internal Revenue for the Twenty-Third District of Pennsylvania. Judgment for defendants in the first two cases, and against defendant in the third case (255 Fed. 364), and the Carbon Steel Company, the Worth Bros. Company, and C. G. Lewellyn bring error. Judgment in the first two cases affirmed, and judgment in the third case reversed.

In No. 2438:

H. V. Blaxter, of Pittsburgh, Pa., and F. DeC. Faust, of Washington, D. C., for plaintiff in error.

R. L. Crawford, U. S. Atty., and B. B. McGinnis, Sp. Asst. U. S. Atty., both of Pittsburgh, Pa., and William L. Frierson, of Washington, D. C., for defendant in error.

In No. 2465:

A. H. Wintersteen, of Philadelphia, Pa., for plaintiff in error.

William L. Frierson, of Washington, D. C., for defendant in error.

In No. 2462:

William L. Frierson, of Washington, D. C., for plaintiff in error.

George B. Gordon, of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and HAIGHT, Circuit Judges

BUFFINGTON, Circuit Judge. These cases concern the construction and application of section 301 of title 3 of the act of Congress of September 8, 1916, 39 St. 756, 780 (Comp. St. § 6336¼b), which provides:

"That every person manufacturing * * * projectiles, shells, * * * or (if) any part of any of the articles mentioned in (b), (c), (d), or (e) shall pay for each taxable year, in addition to the income tax imposed by Title I, an excise tax of twelve and one-half per centum upon the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States."

An examination of the whole act shows it imposes an excise tax on persons manufacturing either certain mentioned war munitions or appliances, or on persons manufacturing any part of any of the said mentioned articles. Therefore two questions naturally arise: First, who shall be deemed manufacturers of the mentioned articles; and, second, who shall be deemed manufacturers of any part of the articles mentioned.

[1] In ascertaining the true construction of the law, and thus carrying out its purpose, this court must necessarily put itself in the position of Congress when it enacted the law, and from the circumstances

and surroundings then existing, and the general purpose then in view, seek to ascertain, from what was meant to be done, how best to construe and apply what was done. When Congress took up this matter the situation was that during the two preceding years of the World War great quantities of war munitions and war accessories had been manufactured in this country, and sold to the Allied governments at high and abnormal prices, owing to the fact they were abnormal products, and the call for them was imperative and instant. It was therefore felt that the large abnormal profits incident to these war contracts created a remunerative field for temporary taxation. That the tax was abnormal and its imposition temporary was evidenced by the provision:

"(2) This section shall cease to be of effect at the end of one year after the termination of the present European war, which shall be evidenced by the proclamation of the President of the United States declaring such war to have ended."

In addition to the feeling that these war supplies manufactured here and sent abroad were proper subjects of temporary taxation, there were other motives which led to the passage of this statute, namely, the pacifist spirit which urged embargo legislation to prevent the exportation of war supplies to belligerents, and the pro-German spirit which asserted the furnishing of war munitions to the Allies was an unneutral act. It will thus be seen that, whatever may have been the impelling motive of individual legislators, the fact is that all united in a common purpose to include the whole subject of war munitions and war accessories in a common class. And since all that were thus sent abroad were manufactured here, indeed the act is expressly directed to "such articles manufactured within the United States," and the profits made from such manufacture were the gauge of the taxation imposed, it is clear that the means Congress used to bring the whole subject-matter of war munitions and war accessories within the sphere of taxation was to take these goods as they were manufactured, and to impose an excise tax on the person who manufactured such articles, or "any part of any of the articles mentioned," and to fix such tax by "the entire net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States." Such being the case, it follows that the pertinent subjects of inquiry where the act is to be applied is, first, to ascertain whether the war munitions or war accessories were articles "manufactured within the United States"; second, if they were so manufactured within the United States, who manufactured such article, and, if so, what were the "net profits actually received or accrued * * * from the sale or disposition of such articles"; third, if they were so manufactured within the United States, who manufactured any part of such article, and, if so, what were the "net profits actually received or accrued * * * from the sale or disposition of such articles."

In thus applying the broad, inclusive terms of the statute, "every person manufacturing * * * shells * * * or any part of any of the articles mentioned," along the lines of inquiry above indicated, it is clear that it must have been in the mind of Congress that complex questions would arise in specific cases, and that these difficulties of spe-

cific application must be solved on some general principles of the act. Turning to the act, we think the broad purpose of Congress is clear to select, as the subject of taxation, war munitions and war appliances, for each of the enumerated articles is such as can be used for war. At the same time it must have been foreseen that many of these articles could also be used for the normal needs of commerce, and those who made them for such normal use were not making abnormal profits. So, also, the articles that in their completed, unitary form were adapted solely for war purposes might have parts which, in and by themselves, could be also used, and would naturally be used, for the normal purposes of commerce. In view of such recognized facts, was it the purpose of Congress to tax the manufacture of such articles, or parts thereof, which, while susceptible of warlike use, were, in point of fact, not so used, but remained in the channels of normal commerce and use? Clearly not; first, because such articles, or parts of articles, when sold in ordinary commerce, did not earn war profits; and, second, because the general purpose of the act not to subject the ordinary normal commerce of the country to this abnormal temporary war tax is manifested even in such warlike agencies as gunpowder, explosives, caps, and the like, by the act providing that such of said articles as are "used for industrial purposes" are excepted.

[2] It would therefore seem that the broad general purpose was to include in the field of taxation all such specified articles or parts thereof as were either made for war purposes or as were withdrawn from the general field of commerce and used for the making of war articles.

Applying these general principles and lines of construction to the act, and in its application to the individual cases arising under it, let us turn to the facts of the three cases here involved, viz.: Carbon Steel Co. v. Lewellyn, Collector; Worth Bros. Co. v. Lederer, Collector; and Lewellyn, Collector, v. Forged Steel Wheel Co.

In the first case it appears the Carbon Steel Company made three substantially similar contracts with the British government, whereby in one contract it agreed "to manufacture 75,000 4.5″ shells lyddite, * * * suitably packed for export, and delivered free alongside steamer New York. * * * Inspection will be carried out at contractor's works by an inspector or inspectors appointed by the Secretary of State."

In a second contract the steel company contracted to sell, and the British government to buy, 425,000 shells. The contract provided that in case of—

"the seller being able to manufacture from its present plants more than 425,000 of the said shells before June 30, 1916, the buyer will accept and pay for any such additional shells up to 175,000."

Payment was to be made on-

"invoices and certificates of inspection, executed by an inspector of the buyer, certifying that such shells have been manufactured and have passed all factory inspection and shop tests with respect thereof. * * * It is understood and agreed that the buyer shall have the right of having one or more inspectors at each of the factories where the shells hereby contracted for, and their component parts, are being manufactured, for the purpose of observing

the manufacture thereof, and of testing the same at any time before delivery, and that the seller or its subcontractors shall furnish all facilities required by such inspector for this purpose. The seller at its expense shall furnish all gauges, including master gauges, to be used in connection with the manufacture of the shells hereby contracted for, and their component parts, including all gauges required by the inspectors of the buyer."

The third contract was substantially of like import.

[3] From the contracts it will be seen that the general purpose of the Carbon Steel Company was to make, or have made—and making is manufacturing—and to deliver in the United States shells contemplated by the act.

In carrying out the contracts the shells were made in the United States; they were accepted by the British government, and the contract price was paid therefor by the government to the Steel Company; and, as a result, there accrued to the Steel Company "net profits actually received or accrued for said year from the sale or disposition of such articles manufactured within the United States." Such being the fact, it would seem the case falls within the general scope of the act, unless the Steel Company can show that in the manufacture of the shells it contracted to have manufactured it did not manufacture the shell as a whole or any part thereof. Is such the fact?

Now, what was done in this case was this: The making of a shell consisted of nine operations, as follows:

"(1) Obtaining suitable steel in bar form;

"(2) Cutting or breaking said steel bars to proper length;

"(3) Converting said cut bars or slugs into a hollow shell forging by means of a hydraulic press;

"(4) The turning of said shell upon a lathe to exact dimensions;

"(5) Closing in one end of said forging to form the nose of the shell;

"(6) Drilling out the case of said shell and the inserting of a base plate;

"(7) Threading of the nose of the shell, and the insertion of the nose bushing, and the insertion in said nose bushing of a wooden plug to protect the thread thereof;

"(8) Cutting a groove around the circumference of said shell, and the insertion therein of a copper driving band, and the turning of said band to required dimensions;

"(9) Varnishing, greasing, and crating of the completed shell."

But when all is said and done, it is clear that the basic operation of shell manufacture was making steel of certain characteristics, for all later steps depended on the composition and characteristics of the steel made in this initial step. This foundation step the Steel Company effected in its own plant, and the relative importance of this first step, compared with the remaining eight, is shown by the fact that the bare material and running expenses involved in this step amounted to somewhat over $2,000,000 as compared with some $4,300,000 paid to subcontractors as their expenditures for work, material, and profits in the other eight steps. The steel thus made in the first step was the property of the Steel Company, it remained its property while the subcontractors completed the other eight steps, then was finally transferred by the Steel Company to the British government. Moreover, during such eight steps every operation of these subcontractors on the original steel was followed up by employés of the Steel Company, who checked

the work as it progressed, and by virtue of the contracts to which we have referred it was subjected to the inspection of the British government provided for in the contract. It will thus appear that every step involved in the manufacture of the shell, from the raw product to the finished shell, was either done by the Steel Company itself or by those whom it hired to do some part thereof, and that the original steel base never passed out of the control and direction and ownership of the Carbon Steel Company.

To us it is clear that if the law here involved were a draft or conscription law, and that from its operation there was exempted from draft "every person manufacturing * * * shells * * * or any part of the articles mentioned," that all the workmen of the Steel Company engaged in making shells here involved would fall within said exception, because they—and therefore the company—were manufacturing shells. We therefore conclude that by virtue of the Steel Company's own work in the first step, and by virtue of its effecting and controlling the other eight steps through its subagents, the Steel Company was manufacturing shells, and therefore subject to the tax imposed by this statute. It follows that the judgment of the court below, which was that the Steel Company could not recover from the government the tax it had paid, must be affirmed.

[4] In the case of Worth Bros. Co. v. Lederer, Collector, coming from the Eastern District of Pennsylvania, the pertinent facts are: The Midvale Steel Company and Worth Bros. Company are corelated to each other, in that both companies are owned by the Midvale Steel & Ordnance Company. The Midvale Steel Company contracted with the French government to sell and deliver about 400,000 high explosive shells, to be made under accompanying specifications, and under inspection of the government as the work progressed. The said company was equipped to completely manufacture shells, and in fact did, at its own plants, so completely manufacture large quantities of the shells thus contracted for. Later it contracted with Worth Bros. Company to furnish the steel and complete six of the initial processes of the shell-making, which six steps constituted about 40 per cent. of the cost of the shells. Thereafter the remaining 29 steps of the shell-making process, and which constituted 60 per cent. of the cost, was done by the Midvale Steel Company itself. Did the work thus done by the Worth Bros. Company on these six initial steps bring it within the provisions of the act as being a "person manufacturing * * * shells * * * or any part of any of the articles mentioned."

Turning to the facts, we note that the six stages of shell manufacture done by Worth Bros. Company were, as found by the court below:

"(1) Smelting the ore in the blast furnace into pig iron without, however, running it into the moulds which would form what are commercially known as pigs.

"(2) In its molten state transferring it with a laddle into an open hearth furnace, where it was converted into steel and tapped out of the furnace and conveyed into moulds in the form of ingots.

"(3) Heating the steel ingot to the proper temperature for rolling when it was rolled in the blooming mill into rounds or blooms.

"(4) The rounds or blooms were then cut with a hot saw into billets of sufficient length, diameter, and weight to produce the required shell forging. At

this point the French inspectors inspected each individual billet to determine whether there were defects in the steel, such as piping or blow holes. After acceptance of the billets so tested, they were chipped to determine whether surface defects existed. At this stage the steel billet, which was the material which was to become the shell forging, is cylindrical in shape, of approximately two-thirds of the outside diameter of the shell forging to be produced and approximately one-third of its length.

"(5) The billet was then taken to the forge shop, heated from two to three hours in a continuous furnace, and placed in the container or die of a hydraulic piercing press. It was pierced while hot by a piercing bar entering one end and pushing its way to within sufficient distance of the other end to leave a closed end or base. During this process the metal, being heated to about 2,100 degrees, is viscous, so that the metal is pushed up to the sides of the die or container. The product of this process was a cylindrical forging, hollow, with one closed and one open end.

"(6) The forging was then taken to a horizontal hydraulic bench and drawn while the metal was hot, so as to increase its length, and conform its inside and outside diameter to the required size of the forging ordered by the Midvale Steel Company."

It will, of course, be noted that all six steps were progressive advances toward the chemical constituents, the shape, and the dimension required by, and essential to, the manufacture of shells in compliance with the contract. And while, in the first three steps, the work was of such a character that the product made thereby could, up to the fourth stage, have been diverted to general commercial needs, yet, as noted, the work done in said three steps was actually done with a view to contract needs and shell requirements. With the fourth step the contract shell inspection of the French government began, and in the fifth step the fluid metal was taken, from the possibility of use for general commercial purposes, by a hollow cylindrical forging process which restricted the steel to the field of use for shells. By the sixth step this hollow cylindrical forging was drawn to a length, and to an inside and outside diameter, which enabled the Midvale Steel Company to thereafter carry forward its twenty-nine progressive steps, which, with the six of the Worth Bros. Company, were required by the contract to complete the manufactured shell of the contract. From this it will be seen the Worth Bros. Company selected the material required in the shell; it made the steel which constituted the shell; by work done upon said steel, it segregated it from the general field of commercial use and limited it to use for shell-making. That some of that material, when imperfect, was scrapped and used for other mechanical purposes only tends the more strongly to show that the work done by the Worth Bros. Company, in accordance with the contract, was shell work distinctively; for, even where it failed by not being up to contract requirements, it was so far removed from the general field of commerce that it was sold, not as an ordinary commercial product, but as scrap, and its subsequent use was only such restricted use for minor objects as scrap heaps permit. It would therefore seem clear that the volume of work done by the Worth Bros. Company—40 per cent. of the cost—and the character of that work—segregating the steel from the general field of commercial use and narrowing it to shell use—made its work such as was aptly described by the act as being "manufacturing * * * shells * * * of any kind, loaded or

unloaded, * * * or any part" of a shell. Indeed, to say that when Worth Bros. Company made the steel which constituted the shell, and when by pressing a cavity in the steel they made an outer rim or shell which gave it such shape as committed and restricted it to shell use, to say that Worth Bros. Company, when they were doing this abnormal work and earning abnormal profits thereby, were making those profits neither from manufacturing shells nor manufacturing any part of shells is to lose sight of substance and of the purpose of Congress in using the plain, broad, inclusive words of this statute. The statute shows on its face that Congress contemplated that cases would arise where parts of the articles named would, if not indeed must, be made by joint co-operation. Indeed, the found facts in this case show that not more than two or three plants in the whole country were equipped to make a complete shell. Shell-making in this country had been going on for the two preceding years. It was well known that the shells made for the Allies in the United States were manufactured by the joint work of different plants. In the light of these facts, it would seem that a construction of the act which narrowed its application to the case of a plant that did the entire work would defeat the whole purpose of Congress, which presumably was to subject the profits of all engaged in the manufacture of shells or any part thereof to this excise tax. Such being the case, we hold the tax imposed on Worth Bros. Company was justly laid, and the judgment of the court below, which held the company could not recover the tax from the government, was right, and should be affirmed.

[5] We next turn to the case of the Forged Steel Wheel Company against Lewellyn, collector. From the proofs it appears the British government made contracts with certain persons whereby the latter agreed to supply it with high explosive shells in compliance with the specifications, requirement, and inspection of the said government. To fulfill such shell contract the contractor made subcontracts with the Forged Steel Wheel Company, by which the latter agreed to manufacture and furnish to said contractor rough steel shell forgings of the character provided in the contract, as to chemical constituents, tensile strength, size, shape, etc. To fulfill its contract, the Forged Steel Wheel Company either made, had made, or bought in the market the grade of steel required. This steel was of a common commercial type known as rounds. These rounds it nicked and broke into 18-inch lengths, which it then heated and put through two forging processes, by the first of which a hole was pierced from one end of the round to within two inches of the other; by the second, the round was lengthened by drawing it through three successive rings of a hydraulic press. The output of the Forged Steel Wheel Company's work was a hollow steel body or shell form, of suitable composition, shape, and length, from which to make, to the British government standards, the high explosive projectiles contracted for. The weight of such shell forms was about 170 pounds. To make this shell form suitable for use as a shell, the contractor to whom the Forged Steel Wheel Company then delivered it was required to dress, bore, and machine it down to 77 pounds. This required some 27 distinct and separate processes.

Such being the facts, did the work of the Forged Steel Wheel Company noted above make it "a person manufacturing * * * shells * * * or any part of" a shell? The court below held it did not, and such holding constitutes the question involved in this case.

In reaching that conclusion the lower court construed the act as though it read "a person manufacturing * * * shells * * * or any *component, completed,* part of" a shell, in that regard saying:

"I am therefore of opinion that Congress meant to levy the tax only upon those persons who were manufacturing and selling at a profit the *completed* things specifically designated in (b), (c), (d), and (e), and on those persons who were manufacturing and selling at a profit any *completed* part of any of those designated things. That one is not a manufacturer of a part unless the manufacture of that part is carried forward by him to the same point of completion to which it would have been necessary to carry it if he had been the manufacturer of the completed thing."

The court was also influenced, first, by the fact that, as stated in its opinion,

"The completed shell is a composite structure, consisting of six different parts: First, the shell body in one piece, cylindrical in shape, with a pointed head to increase its speed in flight and its power of penetration. Second, a copper driving band near the base of the shell body, projecting slightly so as to engage the rifling of the gun. This gives the shell its rotary motion, necessary for precision in flight. Third, a base plate inserted into the bed of the shell to prevent premature discharge. Fourth, a nose bushing of two parts, one of which screws into the shell body and the other into the fuse. Fifth, the fuse, either time or percussion, a highly complicated piece of mechanism screwed into the nose bushing. Sixth, the high explosive charge. These several parts or pieces of mechanism, each delicately constructed, and designed not only individually, but with reference to each other, when assembled together, constitute a high explosive shell."

Starting with the unquestioned premise that a completed shell was made up of assembling six separate and complete parts, the court assumed that the purpose of Congress was not to tax any one but (a) the manufacturer of a completed shell, or (b) the maker of a completed part of a shell; and that because the shell form the Forged Steel Wheel Company made was not a completed part of a shell, that it was therefore not subject to the excise tax imposed by the statute.

Now, it is manifest that, standing alone, the statute neither expresses nor implies any warrant or implication for limiting the broad, inclusive, generic words "any part" to the restricted, specific, qualified term "any completed part." It follows, therefore, that ground for inferring such intent in the mind of Congress must arise from something apart from the language of the act itself. Such intent the court below found in certain decisions of the federal courts involving tariff laws which exempted from duty "manufactured" articles. And these decisions, holding what were "manufactured" articles in tariff legislation, the court below held Congress must have had in mind in passing this excise law, saying:

"We must assume that Congress well knew the distinction between a *completely* manufactured thing, or part of a thing, and a *partial* manufacture of that thing. Many revenue acts have levied a tax upon manufactured articles or parts thereof, and others have levied a tax upon a partial manufacture."

On the other hand, in the Worth Bros. Company Case, decided above, the court below held these tariff decisions did not affect the construction of this statute, saying:

"The rule has been applied in the classification of articles of merchandise imported and subject to customs duties or upon which drawback is allowed. There are decisions as to what constitutes a manufactured article, what constitutes a part of a manufactured article, what constitutes a partially manufactured article, what constitutes a manufacture of certain material, and what constitutes a wholly manufactured article, dependent upon the terms of the law under which a tax is laid upon the article itself, or under which a drawback or other privilege is allowed. I cannot perceive that these cases have any bearing upon the question arising in this case, unless the terms of the act imply that the tax is to be imposed only upon the business of manufacturing to completion shells or parts of shells, and there is no such limitation in its terms. The clear purpose of the act is through taxation of the business or occupation of manufacturing munitions of war to reach the profits of all those engaged in such manufacture, whether engaged in manufacturing to completion or engaged in any part of such manufacturing."

We are of opinion the latter court was right in so regarding these customs decisions, for when the objects which Congress had in view in framing the customs acts and this excise law are considered it will be seen they were wholly different. In customs law the primary object of Congress in their passage was to protect domestic against foreign labor, and to effectuate this object, the customs duties were so imposed that where all the work necessary to be done upon the imported article to fit it for use in the United States had been done abroad, such article, or the part so completed and fitted for use, was to carry out that primary intent, held to be a manufactured article, or a manufactured part, and therefore subjected to the duty. On the other hand, if work upon the imported article, or imported part, before it was fit for use, remained to be done in this country, such article or part was held not to be a manufactured article within the scope of the law, and therefore not subject to the tariff duty. The necessity of bearing this primary purpose in view in construing customs acts was set forth in Tide Water Oil Co. v. United States, 171 U. S. 216, 18 Sup. Ct. 839, 43 L. Ed. 139, where the Supreme Court, referring to a customs act, said:

"The object of the section was evidently not only to build up an export trade, but to encourage manufactures in this country, where such manufactures are intended for exportation, by granting a rebate of duties upon the raw or prepared materials imported, and thus enabling the manufacturer to compete in foreign markets with the same articles manufactured in other countries. In determining whether the articles in question were wholly manufactured in the United States, this object should be borne steadily in mind."

Indeed, it is, on the one hand, this presence of work already done which has fitted an object for use, or it is, on the other hand, a residue of work necessary to fit the object for use, which brings the article within or without the description of the manufactured article of the tariff law. This is well summarized in Tide Water Oil Co. v. United States, 171 U. S. 216, 18 Sup. Ct. 839, 43 L. Ed. 139, where it is said:

"Raw materials may be, and often are, subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name. The material of which each manufacture is formed, and to which reference is made in section 3019, is not necessarily the original raw material—in this case the tree or log—but the product of a prior manufacture; the finished product of one manufacture thus becoming material of the next in rank."

From these decisions it will be seen that these tariff laws deal with manufactured articles, from the standpoint of protecting domestic labor, and the imposition of import duties is an incident in effectuating that main purpose.

But in the excise law in question Congress is dealing with the imposing of taxes as the main object, and with the work done as a mere incident to aid in determining the tax. In that aspect the quantum of the work done is immaterial.

Indeed, from a study of customs decisions, it will be seen that, from the basic standpoint of protecting domestic labor, the imposition of import duties is a mere incident or means to effectuating such main purpose, and the term "manufactured article" must therefore be construed and applied with such purpose in view. It follows, therefore, that in such case the quantum of labor done, or left to be done, is all-important in the practical administration of customs laws. On the other hand, the whole purpose of excise law is to produce revenue, and it is the fact of manufacture, and not the quantum of labor, that is the determining factor. Indeed, the object of the statute, viz. the raising of revenue, may be reached where a minimum of labor is used in the manufacturing taxed; for, as the net profit is the basis of taxation, it follows that the smaller the relative amount expended in physical labor in a manufacturing operation the greater may be the relative net profit which determines the tax. Moreover, it will be apparent that a manufacturing operation in which much labor has been used may not involve any net profit, while another, involving much less labor, may result in taxable net profits. It will therefore be apparent that, in an excise tax on manufacturing measured by net profits, the crucial question is not the quantum of the manufacture measured by steps, but the fact of manufacture resulting in profits. Gauging the operations of the Forged Steel Wheel Company by this standard, it would seem clear that in doing the basic shell work it did that company was, in the broad and general sense of fulfilling this contract, a "person manufacturing * * * shells, * * *" and, by virtue of the particular manufacturing stage it completed in the making of such shells, the company fell within the class of a "person manufacturing * * * any part of any of the articles mentioned." Such being the case, the excise tax was lawfully laid on the "net profits actually received or accrued"

for said year from the sale or disposition of such articles manufactured within the United States. It follows, therefore, the judgment recovered by it below was erroneous, and must be reversed.