(C. D. 1603)

BRYANT & HEFFERNAN, INC.
SCAP FOREIGN TRADE, NEW YORK } v. UNITED STATES

United States Customs Court, Second Division

(Decided March 31, 1954)

*Sharretts, Paley & Carter* (*Howard Clare Carter, Louis J. Paley,* and *Joseph F. Donohue* of counsel) for the plaintiffs.

*Warren E. Burger,* Assistant Attorney General (*Richard E. FitzGibbon* and *Richard H. Welsh,* trial attorneys), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges; FORD, J., dissenting in part

LAWRENCE, Judge: This cause of action challenges the decision of the collector of customs in classifying an importation of raw silk yarns or threads on cones as "yarns made from raw silk, nspf" as provided in paragraph 1204 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1204) and assessing duty thereon at the rate of 40 per centum ad valorem.

Plaintiffs invoke the provisions of various paragraphs of said act, which are set forth below, claiming either freedom from duty by virtue of paragraph 1763 (19 U. S. C. § 1201, par. 1763), or lower rates of duty pursuant to the provisions of paragraph 1201 or 1558 of said act (19 U. S. C. § 1001, par. 1201 or 1558), or paragraph 1211 or 1558 of said act (19 U. S. C. § 1001, par. 1211 or 1558), as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802.

The provisions of the statutes above referred to read as follows, with emphasis added:

Paragraph 1204 of the Tariff Act of 1930:

Sewing silk, twist, floss, and *silk threads or yarns* of any description, *made from raw silk*, not specially provided for, 40 per centum ad valorem.

Paragraph 1763 of said act, title II, free list:

*Silk, raw, in skeins reeled from the cocoon, or rereeled, but not wound*, doubled, twisted, *or advanced in manufacture in any way.*

Paragraphs 1201 and 1558 of the Tariff Act of 1930:

PAR. 1201. *Silk partially manufactured*, including total or partial degumming other than in the reeling process, *from raw silk*, waste silk, *or cocoons*, and silk noils exceeding two inches in length; all the foregoing, if not twisted or spun, 35 per centum ad valorem.

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

Paragraphs 1211 and 1558 of said act, as modified, *supra*:

| | | |
|---|---|---|
| [1211] | All manufactures, wholly or in chief value of silk, not specially provided for | 35% ad val. |
| [1558] | All raw or unmanufactured articles not enumerated or provided for (except frogs and frog legs) | 5% ad val. |

Although plaintiffs' primary claim is for free entry in accordance with provisions of paragraph 1763, *supra*, some reliance is placed upon an alternative claim that the merchandise should be classified as a raw or unmanufactured article not enumerated or provided for pursuant to the provisions of paragraph 1558, as modified, *supra*, and dutiable at 5 per centum ad valorem.

With respect to the other alternative claims, plaintiffs state in their brief that "these claims are not specifically pressed nor are they abandoned."

At the trial of this case, an official sample of the subject merchandise was admitted in evidence as exhibit 1. Illustrative exhibit 4 was received to depict silk thread or yarn having the same physical characteristics as exhibit 1 but in skein form. Certain photographs, photostats, and various other exhibits were also received in evidence

and will be referred to wherever deemed necessary in the course of this opinion.

It was agreed between counsel that the involved merchandise has not been "doubled" or "twisted," as those terms are used in paragraph 1763, but nothing was said with respect to the word "wound" in said paragraph. It was further agreed that the silk strands or fibers of exhibit 1 and illustrative exhibit 4 are the same in their physical properties, and that exhibit 1 is not sewing silk, twist, or floss, as those terms are used in paragraph 1204 of the Tariff Act of 1930.

Eight witnesses testified for the plaintiffs, and it was agreed that two additional witnesses, had they been called, would have testified to the same effect as the witness Weber, to whom further reference will be made *infra*.

Defendant called three witnesses, and it was agreed that one additional witness would have testified in the same manner as witness Elbogen (referred to later), if he had been called.

The salient features of the evidence introduced by plaintiffs are here set forth.

Robert A. Hickerson, chief of the silk section, a part of the economic and scientific section under the Supreme Commander for the Allied Powers in Tokyo, Japan, a very intelligent and well-qualified witness, in a graphic description of the processes employed in producing the imported merchandise from cocoons, testified that—

With the completion of the sericulture process of producing the cocoon, the farmers in Japan bring their cocoons to the Japanese silk filatures. The cocoons then are dried for the purpose of putting them in a condition where they may be stored until such time as they can be reeled at the actual filatures. There are usually several large warehouses where these cocoons are stored and in the process of making raw silk, the very first process is to remove the cocoons from the warehouse, bring them to the filature where they are inspected and sorted very carefully for quality and with the inspection—completion of the inspection process, it is then necessary to soften up the cocoon so that they can be reeled in the reeling basins. This process takes place by putting the cocoons into an endless chain within a boiling machine, the boiling machine consists of a machine about 20 feet long, where the cocoons are immersed in different termeratures [*sic*] of water to soften them up for the reeling process.

\*　　\*　　\*　　\*　　\*　　\*　　\*

With the completion of the boiling process, which has softened the cocoon for reeling, the cocoons are mounted to be immersed in water by being put in small wooden buckets and carried by little carts into the reeling room, where the reeling basins are located. The reeling basins usually consist of 20 small reels, approximately 8 inches in diameter and that are at the top of the machine and the cocoons are immersed in water and the proper number of cocoons are put in a combination to be reeled, obtaining the process desired, the denier of the silk thread.

With the completion of the reeling process, the reeling reels usually consisting of 20 reels on one rod are removed from the reeling machine and taken to the

rereeling room. The silk is then rereeled from the small 8-inch reeling reel on to a larger wooden collapsible reel, being the diameter of a standard skein. This process is known as a rereeling in preparation for making the standard skein. With the completion of the proper amount of silk being rereeled on to the skein-sized reel, the skein-sized reel is then collapsed—I beg your pardon. Before it is collapsed, the lacing process for keeping the silk straight when a skein is made is performed. After the silk is laced and the end tied into the skein so that it may be found by the manufacturer, it is then collapsed and the skeins are twisted into a skein form. Then, 30 skeins are put together in a hand press and tied with cotton draw strings making a book. The books of silk are then put into a package known as one bale of raw silk. That is the commercial manufacturing process from the cocoon to the bale as performed in a reeling filature.

\*      \*      \*      \*      \*      \*      \*

JUDGE FORD: What is the reason or reasons for the rereeling process?

THE WITNESS: The reels, the silk is wound on from the cocoon, are small aluminum reels and the rereeling process is to put the silk into a form that may be spoken of as a packaging form to make the silk available for export. In other words, it could not be shipped on the aluminum reels as it would be too heavy and too expensive.

\*      \*      \*      \*      \*      \*      \*

\* \* \* The Exhibit 5 shows the cocoons in the water with the filaments being quite clear as many small threads going up to a porcelain eyelet, approximately in the center of the picture. This eyelet can be seen on Exhibit 7 for Identification with a small tension wheel to the right of the porcelain eyelet. The silk filaments, not saying any definite number, because it ranges as I have said, the silk filaments pass through that eyelet and go to the top tension wheel approximately in the center of the picture. It is passed over the top tension wheel and is brought down to the bottom tension wheel. It goes around the bottom tension wheel and then actually comes back and joins the thread passing up to the top tension wheel. To put in the cohesion or the loop so-called, it is actually wrapped around itself, the desired number of turns and then passes directly to the reeling reel at the top of the picture.

\*      \*      \*      \*      \*      \*      \*

In Japan, the raw silk on cones in my opinion is not advanced as far as the raw silk when it is placed in skein form, as certain processes have been completely eliminated.

JUDGE FORD: You say it is not as advanced?

THE WITNESS: Not as advanced, no, sir.

JUDGE FORD: What process have they eliminated?

THE WITNESS: In my explanation of the photographs, sir, I have only reached the stage where the raw silk as rereeled in preparing to making a skein was still on the wooden reel on to which they had been rereeled. I believe it is on Exhibit 15. I have led only to that step of the process of preparing raw silk in skein form. The processes that follow Exhibit 15, is for a lacing process with cotton thread and tieing in the end of the raw silk on the wooden rereeling reel. After the raw silk has been properly laced, this reel is broken down so that the raw silk may now be removed. It is then necessary to take the raw silk and twist it into skein form, which is another process and then the skeins, 30 of them, are taken, and put into a wooden press to put the silk into book form as was shown in Exhibit 17. Therefore, from Exhibit 15, which is the silk rereeled on to the wooden reel, and Exhibit 16, which is the silk rereeled, under the cone form, in Exhibit 16, the raw silk as rereeled in cone form, there is no further processing

other than wrapping for packing purposes; whereas, in Exhibit 15, where the raw silk is still on the wooden reeling reel, it must be laced, removed from the reel, twisted into skein form, put into wooden press, put into book form, and then packaged for export.

At the conclusion of Hickerson's testimony, plaintiffs called Ichiro Haratani, for 27 years associated with the Gunze Silk Manufacturing Co., Ltd., of Japan; Gizo Sakaguchi, director and currently chief of Kanegafuchi Spinning Co., Ltd., where he had been employed for more than 25 years; and Takashi Omura, for 17 years chief of promotion for the Unit of the Raw Silk Bureau of the Japanese Government, and it was agreed by counsel for the respective parties that if these witnesses were asked the same questions relating to the process on both direct and cross-examination, as were propounded to the witness Hickerson, they would answer in the same manner as did witness Hickerson.

The next witness was Takeshi Baba, who stated that he was associated with the Katakura New York Corp. This witness explained how a number of the strands of raw silk as it is reeled from the cocoons are made into one strand or thread, as follows:

Usually, seven or eight cocoons are making together and they make the raw silk yarn and they go to small wheels. At that time, raw silk yarn is consisting of seven filaments of cocoons. So, we must make together those filaments. So, before going to the reel—what shall I say?—making a closing each yarn, to make together those several filaments of cocoons and then going to the small reels. After reeling then we have a re-reeling process to make in a skein or cones or some other types. That is the whole process.

\* \* \* \* \* \* \*

Well, as I told you, this raw silk yarn consists of seven or eight cocoon filaments, and we have to make together those filaments, closing each filament at this point, and then this silk yarn going in one yarn. If you don't, then those filaments are separated. So, to prevent them from separating you cross them.

The process by which one filament is wound around the other is called the cohesion loop, as illustrated by the hand-drawn sketch in exhibit 21. The threads in exhibit 1 are crossed in the same manner as the threads in exhibit 4.

Robert Frick testified that he was employed for 12 years as technician and stylist of the synthetic filament division of J. P. Stevens & Co., which company operates 68 cotton, wool, and worsted rayon, and some silk mills, in the United States. He graduated from Seidenweb Schule, in Zurich, Switzerland, after which he worked for Stehli & Co. in Italy for 1 year and for three other different firms. After coming to the United States, he worked 21 years for Stehli & Co. in the same capacity he now works for J. P. Stevens.

Frick also testified that in 1949 his company purchased 1,200 pounds of raw silk on cones like exhibit 1 to see if this silk could be

run the same as rayon in a high-speed warper; that it was not very successful because the silk was too wiry or lively; that his company used only 300 pounds and sold the remaining 900 pounds. The witness admitted, however, that there was a difference between the warping machinery used for the production of rayon and the warping machinery used for the production of silk yarn. "Rayon machinery is of higher speed and uses a different package in general."

The witness further testified that he had had experience in the production of silk threads from yarn like exhibit 4; that he did it in Italy in 1913 and supervised it for Stehli & Co. for 21 years. He explained this operation as follows:

If you take this skein here from the first operation—this skein is to be soaked in soap and oil. It is then wound into a spool and from there it is either twisted or plyed in different kinds of threads. We have all kinds of silk twisted. We have Tram, Organzine, Grenadine, Crepe, which are the different kinds of threads you can make out of this basic package here.

\* \* \* \* \* \* \*

It is immersed in a bath of soap and oil and it is left in that condition for hours. Then it is taken out of that thing, hung up and dried. Then it goes in the winding operation where the skeins are put on a shaft and from the shaft it is wound into a spool.

It was explained by the witness that the purpose of this soaking process is "To make it less wiry and to soften slightly the gum to make it more pliable"; that in the course of his experience he had become acquainted with the process known as "doubling," and that if you want to make a thicker thread you combine 2, 3, 5, 10, or 20 threads, or whatever you want; that there are two different kinds of winding—exhibit 22 (silk thread on a spool) is wound parallel and exhibit 1 (silk yarn on a cone) is an example of cross-winding. He also stated that he was acquainted with the process known as "doubling" and "twisting." "You can twist a single yarn from a spool like this [exhibit 22], but most of the times they are doubled and then twisted. It depends on what kind of cloth you want to make"; that in his experience, raw silk, like exhibit 4, was not doubled and twisted without first having been soaked; that the process of joining into one strand the several threads or filaments in exhibit 4 is known as spinning.

On cross-examination, Frick testified that he ordered exhibit 1 because he wanted to see if he could use it on a high-speed warp machine. With reference to the method of placing the raw silk yarn on exhibit 1, and the name by which that method is known, the witness testified in substance that exhibit 1 was produced on a coning machine as distinguished from a winding machine. "It makes a package like a cone which is a cross, diamond package, which we call in the industry coned."

With reference to the use to which exhibit 1 was put after importation, the witness stated it was immediately put to use on a machine for making warp and, in order to weave any silk, it is necessary to transfer it from a skein and put it on "some kind of a package."

Frick testified that millions of pounds of silk were wound without soaking and that in transferring a skein to a cone the product would have to be wound on a spool like exhibit 22 and then wound on a cone. He also stated that soaking would not be necessary prior to winding.

Ralph Weber testified that he was technician and general manager of Montauk Mills; that he started in a silk mill in 1906 and worked his way through the mill from every department, including winding, warping, quilling, weaving, fixing, and at one time was in complete charge of a winding and warping department where he had supervision over the winding of raw silk; that he supervised the soaking, preparing the soap in solution, and the winding of the skeins of raw silk; that the ingredients used were oil, soap, and water under temperature control; that the purpose and functions of soaking skeins of raw silk are to take the stiffness out of it and make it pliable so as to be used with greater efficiency; that he is acquainted with the processes of doubling and twisting raw silk. Describing the processes to which exhibit 4 would be subjected, the witness testified as follows:

* * * When received by the mill in this form, a skein form, is broken open as far as the bales were concerned, loosened up and put into a solution, a soaking solution of soap, oil and water, of a prescribed temperature, and soaked for a prescribed length of time, depending upon the purpose that the silk was to be used for.

\* \* \* \* \* \* \*

It was then taken out of the soaking solution and dried by whiz or centrifugal force, and then hung up to dry further. After it was dried to the proper extent, it was taken and put on what was known as swifts and wound from there on to bobbins, put on to bobbins in the winding process.

\* \* \* \* \* \* \*

Q. Well, in processing it further into thread what steps are taken?—A. Well, it is already a thread when it comes into this form. It is a single thread of a certain size.

The witness also stated that he had used raw silk, such as exhibit 4, by putting it on a bobbin and producing warp therefrom. Based upon his experience, and the fact that the thread of exhibit 1 is in all respects the same as the thread in exhibit 4, the witness testified that he had used exhibit 1 in its present condition; that he had a little difficulty, but that "we overcame it."

JUDGE FORD: In other words, did you say you have used Exhibit 1 without washing it?

THE WITNESS: Yes, sir.

JUDGE FORD: Successfully in your business?

THE WITNESS: The amount that I did use was all right. We found we hadn't repeated the process. We haven't made more than the one sample lot.

\* \* \* \* \* \* \*

Q. Is Exhibit 1 wound as that term is used in the industry, from your experience, and as it is related to raw silk in skeins?—A. Well, winding is related to this and raw silk in skeins. A skein is considered winding, too, and winding on to a skein and winding on to a cone are both winding as far as I can understand it and as far as I know it.

Q. Would you say Exhibit 1 and Exhibit 4 are wound in the same sense?—A. Well, Exhibit 1 would be wound, cone wound, where Exhibit 4 would be skein wound or reel wound.

It appears further from Weber's testimony that in a literal sense exhibit 1 would be wound on to a cone just the same as exhibit 22 is wound on to a spool; that in using exhibit 1 his firm did not find it necessary to soak it because it came in a cone form; that he used exhibit 1 for warps in the condition as imported; that he usually soaks raw silk prior to winding, but he did not always do so; that it is also used without being soaked for the production of certain types of fabrics; that the weaver does not always soak exhibit 4 prior to winding it. Whereas the witness' experience with exhibit 1 was somewhat experimental, he had, in fact, made warps out of it and prepared it for weaving cloth which proved to be satisfactory. The witness was asked—

JUDGE FORD: Mr. Weber, why do you say that Exhibit 1 can be used without washing and then you refer to Exhibit 4 and insist that that must be washed?

THE WITNESS: Only for the purposes of doubling and throwing. I testified that it could be wound dry; if it is wound dry it can also be used for warping dry, such as this, Exhibit 1.

John Launay, appearing for the plaintiffs, testified that he had been engaged in the silk business for some 19 years; that his family had been manufacturers of textile fabrics from father to son; that at the age of 21 years he started working his way up in his father's factory in France; and that he is presently connected with the Towanda Silk Corp.

Asked to describe the processes by which raw silk, like exhibit 4, is manufactured into yarns or threads in the United States, the witness stated:

The first operation is soaking. Then, after the soaking operation, which is whizzing, then the drying operation. After the drying, the winding operation on to a spool, and this would be the starting point for any subsequent processes you want to use the processes for.

The witness then stated that the subsequent processes would be doubling and twisting; that raw silk like exhibit 4 can be doubled and twisted without soaking.

The defendant then called several witnesses, whose testimony is described below.

George Friedlander, vice president in charge of the throwing division of the DuPont Corp. for about 15 years and with the company since 1925, testified that in the throwing division they did all the

operations that come under the head of throwing, which are winding, doubling, twisting, cone winding, spooling, soaking—any combination or sequence of those operations are considered throwing; that his concern processed over 100,000 bales of raw silk each year; that his company had processed raw silk like exhibit 4 by winding it, warping it, doubling it, twisting it, winding it on cones, winding it on quills or cops, and weaving it; that such merchandise was not always treated prior to winding it on to spools:

If it were for certain purposes in warps it was wound dry and on to spools and from the spools it was drawn on to beams and it was then called a warp; it was then woven on a loom by the interlacing—by the weft into the warp which is what makes cloth.

Friedlander also testified that if this raw silk was to be used for warping it was wound without being soaked; if it was to be doubled or twisted it was invariably soaked; exhibit 1 was silk wound on a cone; in the silk industry the term "wound" or "wind" has a particular significance; it means transferring from one package to another, such as exhibit 1 and exhibit 22; exhibit 1 represents a type of winding known as cone winding, and exhibit 22 represents a type of winding known as spool winding; in the silk industry, it is not essential that silk, in order to be wound, must first be immersed in a solution of soap and oil or any other solution; in the silk industry the term "wound silk" means silk that has been transferred by winding from its original form on to a spool or other package.

Leon J. Weil testified for the defendant substantially as follows: That he has been employed by Kahn & Feldman, Inc., since 1913, except for 2 years spent in the Navy; that his company up to 15 months ago manipulated, processed, or "threw" all forms of raw silk and dyed silk; that its business consisted of selling thrown silk and processing silk in the capacity of a commission throwster; that Kahn & Feldman, Inc., had imported hundreds of thousands of bales of raw silk during the period of his employment, except for the years from 1940 to 1946 or 1947, during which period the Government had "confiscated all supplies" of such material, and that at the present time his employer is engaged in nylon processing.

This witness testified that "wound silk" was a process that is applied to raw silk that would cause it to be changed from one form into another "on to the package that it is intended to be used from," such as a spool or a cone or a bobbin or a parallel tube; that, if raw silk is to be used in a dry state, it does not require soaking prior to winding, but if it is to be used in an altered state, it requires soaking; that the fact that raw silk was wound on to a cone, such as exhibit 1, would make it wound silk; that exhibit 1 could be used in its present condition for weaving; that it is not essential that it be soaked prior

to winding for high-speed warping, because in warping for weaving operations it is not unusual for a manufacturer to use raw silk that has not been soaked.

George Elbogen testified for the defendant that he learned the silk business from 1907 to 1912, both in a clerical capacity and also in the throwing plant and weaving plant; that, in 1912, he became connected with the import of raw silk and remained in that business until 1921, when he established his own business, which is still in existence; that he has two throwing plants and is familiar with all the phases of that industry; that he imports two or three thousand bales of raw silk each year.

This witness also testified that he had processed raw silk similar to exhibit 4 since 1921, and that it does not make any difference whether or not, prior to being wound, it had been soaked; that "Wound silk is silk that is wound from the original state of the skein on to spools, bobbins, or cones."

Analysis of the record indicates that there is little, if any, material disagreement between the parties upon the fundamental facts of the case. Their differences concern the proper application of the law to the facts.

To uphold its contention that the imported commodity is not yarn or thread made from raw silk, plaintiffs cite numerous cases in support of the "preexistence" rule. *Burlington Venetian Blind Co.* v. *United States*, 1 Ct. Cust. Appls. 374, T. D. 31456; *United States* v. *Burlington Venetian Blind Co.*, 3 Ct. Cust. Appls. 378, T. D. 32967; *United States* v. *Walter et al.*, 4 Ct. Cust. Appls. 95, T. D. 33371; *United States* v. *Macy & Co.*, 7 Ct. Cust. Appls. 8, T. D. 36256, and numerous other cases, including *Cohn & Lewis* v. *United States*, 25 C. C. P. A. (Customs) 220, T. D. 49335, and *Alfred Kohlberg, Inc.* v. *United States*, 27 C. C. P. A. (Customs) 354, C. A. D. 111.

Those cases establish the principle that the language "made of" (the equivalent of "made from"), "manufactured of," or "composed of" presupposes that the material of which an article is made, manufactured, or composed existed before the article itself came into existence. As stated in the *Macy* case, *supra*—

Now, we think it is clear that the quoted part of paragraph 358 requires that an article to be made in whole or in part of braids thereunder must be made in whole or in part of something which has already attained a status or condition entitling it to be regarded as a braid in and of itself.

It is upon this theory that plaintiffs insist that the subject merchandise is not thread or yarn "made from" raw silk and, consequently, that the collector erroneously so classified the importation. This contention we believe to be sound and well supported by ample authority. As above indicated, it has been held in numerous cases

that when Congress provides for an article made of a particular material, that material must have preexisted as such before the article itself was made or manufactured therefrom.

It is of little consequence that the subject merchandise is referred to as silk threads or yarns. The important fact is that the silk threads or yarns are not *made from* raw silk. They are raw silk in its first estate, differing in no respect from raw silk in skeins, except that instead of being in skeins it is on cones. Nevertheless, the constituent elements of the product are the same as when the raw silk first appeared on the reels as gathered from the cocoons. It is not disputed that if the merchandise had been imported in the form of skeins, instead of on cones, it would have been entitled to free entry in paragraph 1763.

It is clear from the record that the imported commodity, represented by exhibit 1, is nothing more or less than a cone of raw silk yarn. It had no preexistence as raw silk. It became raw silk or raw silk yarn in its very inception when reeled from cocoons. Hence, it follows that the article in controversy should be regarded, as a matter of law, not as a yarn *made from raw silk* but as a yarn *made from cocoons*.

It should not be overlooked that cocoons and raw silk are different commodities; cocoons are described and provided for in paragraph 1762 of the tariff act; raw silk is described and provided for, with certain limitations, in paragraph 1763.

We conclude, therefore, that the collector of customs erroneously classified the importation as a yarn made from raw silk in paragraph 1204, *supra*.

We shall now consider together the alternative claims of plaintiffs that the merchandise should be classified either for free entry in said paragraph 1763, which reads—

Silk, raw, in skeins reeled from the cocoon, or rereeled, but not wound, doubled, twisted, or advanced in manufacture in any way.

or classified for duty in paragraph 1201 of said act as—

Silk partially manufactured, * * * from raw silk * * * or cocoons * * *.

Although plaintiffs make no argument with respect to this latter claim, defendant, in its brief, presents compelling reasons for classifying the merchandise in paragraph 1201, rather than in paragraph 1763. Ample support for this conclusion is found in the case of *United States* v. *Klotz*, 133 Fed. 808, T. D. 25790, affirmed in *Klotz* v. *United States*, 139 Fed. 606, T. D. 26450.

The *Klotz* case arose during the life of the Tariff Act of 1897 and, from an examination of the opinions of the courts in that case, the following information is derived: The merchandise consisted of raw silk wound on tubes or cops. It had been classified by the collector

of customs in paragraph 384 of the act of 1897, which corresponds with paragraph 1201 of the act of 1930, and, so far as pertinent here, reads as follows:

Silk partially manufactured from cocoons or from waste silk, and not further advanced or manufactured than carded or combed silk * * *.

It was claimed by the importer in the *Klotz* case that raw silk wound on tubes or cops was entitled to free entry in paragraph 660 of the act of 1897, which is here quoted:

Silk, raw, or as reeled from the cocoon, but not doubled, twisted, or advanced in manufacture in any way.

The language of paragraph 660 was slightly changed when it was reenacted as paragraph 672 of the Tariff Act of 1909 and reads as it does in paragraph 1763 of the Tariff Act of 1930, as follows:

Silk, raw, in skeins reeled from the cocoon, or rereeled, but not wound, doubled, twisted, or advanced in manufacture in any way.

The only significant change in the free provision was the phraseology which limited the free paragraph to raw silk *in skeins*, as reeled from the cocoon or rereeled, and the further qualification that it should not be "wound," "doubled," "twisted," or "advanced in manufacture in any way," as in said paragraph 660.

An examination of the changes in the phraseology of the free paragraph suggests that they were made to conform to the decision in the *Klotz* case and to definitely limit the application of the paragraph to silk in skeins.

Reverting again to the *Klotz* case which, as above pointed out, related to raw silk wound on tubes or cops, the circuit court was of the opinion that the winding of the silk on tubes or cops was an advance in manufacture within the meaning of said paragraph 660.

The circuit court further stated that the silk, as imported, "had been re-reeled by machinery from skeins upon tubes or spools which were adapted to fit into a silk loom and immediately woven without further manipulation, instead of being imported in skeins, as was the custom."

The importer in that case argued that winding the silk on tubes or cops did not change its character from that of raw silk and, hence, that it was within the free paragraph. The court answered this argument by saying—

* * * it nevertheless clearly appears from the evidence that the American silk throwster is deprived of performing one of the operations necessary to finishing the raw product.

In that case, as in the present one, it was admitted that if the merchandise had been imported in skeins as removed from the reel it would have been entitled to free entry.

Another significant observation of the circuit court is the following:

* * * A fair assumption is that Congress, when the tariff act was passed, understood that raw silk was commercially known as silk in skeins; it never having been imported in any other form.

The circuit court accordingly held that the importation there in controversy was properly classified in paragraph 384 of the act of 1897 as "Silk partially manufactured from cocoons, * * * and not further advanced or manufactured than carded or combed silk."

In reviewing the case, the court of appeals, second circuit, pointed out that the "free list of the tariff act of 1857 contained an identical provision" to paragraph 660 of the Tariff Act of 1897, namely—

Silk, raw, or as reeled from the cocoon, but not doubled, twisted, or advanced in manufacture in any way.

Further, the court observed—

* * * At that time, and *at the date of the present act* [1897], the raw silk of commerce was imported in skeins, and *in no other form.* [Italics added.]

In describing the "raw silk of commerce," the court stated:

* * * It was silk (1) as drawn from the cocoon, consisting of a single thread, composed of several of the gummy filaments spun by the worm and formed by the aglutination of the several filaments in passing through the reel, and (2) wound off the reel into the skein. The raw silk from Japan was re-reeled from a smaller to a larger reel, and transferred from that to the skein, and in that operation underwent to some extent a cleansing process. The thread of the re-reeled, like that of the once-reeled, silk, was neither twisted nor doubled, but consisted merely of the filaments from the cocoon, aggregated and compacted together by the gum.

The language above quoted bears a clear indication of the reasons for the changes embodied in paragraph 672 of the act of 1909 in recasting paragraph 660 of the act of 1897.

To quote further from the opinion of the appellate court in the *Klotz* case—

* * * We regard the *winding* as an advance in the manufacture of raw silk. The raw silk of the importations has been advanced to the same extent. It is true that the thread resulting *does not differ in conformation, physical characteristics, or genus* from the raw silk of skeins; but nevertheless it has been advanced a stage in preparation for its ultimate use, and, although it is still raw silk, it is not the raw silk of the paragraph "not advanced." [Italics supplied.]

Further, the court made this significant observation—

* * * Congress undoubtedly had in mind, when the provision was inserted in the tariff act, *the raw silk in skeins*, which was the filament as reeled from the cocoon or re-reeled as the case might be. [Italics added.]

If, therefore, paragraph 660 of the act of 1897, which did not mention raw silk "in skeins," was, nevertheless, designed to apply only to raw silk in that form, the language of paragraph 1763 of the present act should not be given a broader meaning.

In affirming the decision of the circuit court, the appellate court said—

> * * * If it be conceded that they [importations of raw silk wound on cops] have not been manufactured into a new and different article having a distinctive name, they have nevertheless been advanced into an article having a new and different use, and consequently they are raw silk in an advanced state.

We have also examined the case of *United States* v. *Stewart*, 133 Fed. 811, T. D. 25898, which relates to raw tussah silk in skeins but find nothing therein which in any way conflicts with the views herein expressed.

Inasmuch as the decisions in the *Klotz* case were rendered in 1904 and 1905, and the *Stewart* case in 1904, it is obvious that they were known to the Congress when it enacted paragraph 672 of the Tariff Act of 1909.

The reasoning of the courts in the *Klotz* case leads us to the conclusion that upon the facts in the case at bar the importation should be classified in paragraph 1201 of the act of 1930 as silk partially manufactured from cocoons. Accordingly, the claim for free entry as provided in said paragraph 1763 is untenable.

In addition to the cases above referred to, we have examined the other authorities cited by the parties but find nothing therein which militates against the conclusion herein reached.

The claim of plaintiffs for classification of the importation within the purview of paragraph 1201 of the Tariff Act of 1930 as silk partially manufactured from cocoons, for which duty at the rate of 35 per centum is provided, is, therefore, sustained. All other claims are overruled.

Judgment will be entered accordingly.

#### OPINION DISSENTING IN PART

FORD, Judge: The primary claim of the plaintiffs herein is that the involved merchandise is entitled to free entry under paragraph 1763 of the Tariff Act of 1930 as silk, raw, in skeins reeled from the cocoon, or rereeled, but not wound, doubled, twisted, or advanced in manufacture in any way.

I concur in the action of my associates in denying free entry to the involved merchandise under paragraph 1763, and submit in support of my conclusion in this respect the following:

In enacting paragraph 1763 of the Tariff Act of 1930, Congress saw fit to require that silk, raw, in order to obtain free entry under that paragraph, should be in skeins. An examination of the sample in this case is convincing that the involved merchandise, as imported, is not in skeins. This is supported by the following, which transpired during the trial:

JUDGE FORD: Mr. Donohue, you admit that Exhibit 1 is not in the form of a skein in any manner, shape, or form?

MR. DONOHUE: Yes, your Honor, we admit that.

This admission on the part of counsel for the plaintiffs is, in my opinion, sufficient ground, in and of itself, for denying free entry to the involved merchandise. Further, under the *Klots* and *Stewart* cases, cited by my associates, it cannot be denied that the transferring of the raw silk from the skein form, like exhibit 4, to the cones, like exhibit 1, did, in fact, advance in manufacture the imported merchandise. In the *Klots* decision, an advance in manufacture was held to be sufficient to warrant a denial of free entry for the merchandise there involved. The principle there stated, has equal application and force here.

If the involved merchandise may be wound or transferred from the skein on to cones, and thus adapt it to the machinery for weaving or finishing the product at the place where the raw silk is reeled from the cocoons, then, manifestly, the labor of the "throwster" in this country is lessened, and the protection to American labor, which Congress undoubtedly intended to give, is diminished.

In view of the different classifications, the different claims made and considered, and the different statutes involved in the *Klots* and *Stewart* cases, relied upon by the majority, from those same factors involved herein, I do not consider those cases as authority for holding the involved merchandise dutiable as silk partially manufactured from cocoons under paragraph 1201 of the Tariff Act of 1930. In none of those decisions was the merchandise held dutiable as silk partially manufactured from cocoons.

I readily agree that the involved merchandise is partially manufactured, as stated in the majority opinion. However, based upon the record herein, and under the *Veit* case, *infra*, it seems clear that the manufacturing process has proceeded to the point where the involved merchandise has been converted into a yarn susceptible of being used for knitting, weaving, or sewing, and was actually used for weaving.

Exhibit 1 was classified by the collector as a yarn. Counsel for the defendant, in its brief filed herein, strenuously contend that the involved merchandise is a yarn. Counsel for the plaintiffs, in their brief filed herein, assert that "Exhibit 1 is raw silk yarn," and the record shows no attempt was made by plaintiffs to establish that exhibit 1 is not a yarn. Plaintiffs' witness Frick testified that he immediately put exhibit 1 on a machine to use in making warps for weaving, without any further processing. Witness Weber testified that he has used successfully exhibit 1 without washing it. With reference to exhibit 4, which is in exactly the same shape and form as exhibit 1, except that exhibit 1 has been wound on to a cone, this

witness stated: "Well, it is already a thread when it comes into this form. It is a single thread of a certain size."

If, as testified by the witness, exhibit 4 "* * * is a single thread of a certain size," it logically follows that it is a yarn when it is processed or manufactured to the stage of exhibit 1. The Congress has made it clear by the language employed in said paragraph 1763 that it considered merchandise in the form of exhibit 4 as raw silk reeled from the cocoon or rereeled. This was the holding in the *Stewart* case, cited by the majority. Of this decision Congress was charged with knowledge when it enacted said paragraph 1763, and, therefore, gave congressional approval to the judicial construction placed upon the language in controversy in the said *Stewart* case. This requires a finding or holding that the merchandise represented by exhibit 4 was silk, raw. It logically follows, therefore, that the involved yarn was made from silk, raw, and that it was not made from cocoons.

It is established by this record that raw silk in skein form, like exhibit 4, cannot be used as warp for weaving, without further processing or manufacturing, and that merchandise in cone form, like exhibit 1, is capable of being used, and that it was actually used, as warp for weaving. In view of these facts, it cannot be successfully contended that the winding of the raw silk, like exhibit 4, on to cones, like exhibit 1, does not convert the raw silk of exhibit 4 into a yarn.

The fact that the constituent elements of the involved merchandise, represented by exhibit 1, are the same as the constituent elements in exhibit 4, or are the same as the constituent elements in the raw silk when it first appeared on the reel, is not material to a determination of the question here presented. Undoubtedly, the constituent elements in the boxes, furniture, doors, window sashes, trimmings, and the thousand and one other articles manufactured wholly or in part of wood, were the same as the constituent elements in the boards, planks, joists, scantlings, etc., in the example used in the *Tide Water Oil Co.* case, *infra*. Yet, in that case, the Supreme Court held that:

The material of which each manufacture is formed, * * * is not necessarily the original raw material—in this case the tree or log—but the product of a prior manufacture.

In the instant case, the raw silk as it was reeled from the cocoon does not meet the definition of a "yarn," as that term is defined in *United States* v. *Veit, Son & Co.*, 8 Ct. Cust. Appls. 290, T. D. 37540. Therefore, the holding of the majority that the involved merchandise was "a yarn made from cocoons" would appear to be erroneous. No contention is made that the raw silk as it was reeled from the cocoon was known as materials for knitting, weaving, or sewing. The record discloses that the raw silk as it was reeled from the cocoon was not susceptible of being used for knitting, weaving, or sewing, and that it was not known as material for such uses.

In considering the material from which the involved yarn was made, we must take that material in the condition in which it appeared immediately prior to its being converted into the yarn. At that stage, the material was raw silk, reeled, such as Congress made specific provision for in said paragraph 1763.

After citing a number of cases in support of the preexistence rule, the majority quote the following from *United States* v. *Macy & Co.*, 7 Ct. Cust. Appls. 8, T. D. 36256:

Now we think it is clear that the quoted part of paragraph 358 requires that an article to be made in whole or in part of braids thereunder must be made in whole or in part of something which has already attained the status or condition entitling it to be regarded as a braid in and of itself.

Following the above quotation, the majority opinion states:

It is upon this theory that plaintiffs insist that the subject merchandise is not thread or yarn "made from" raw silk and, consequently, that the collector erroneously so classified the importation. This contention we believe to be sound and well supported by ample authority. As above indicated, it has been held in numerous cases that when Congress provides for an article made of a particular material, that material must have preexisted as such before the article itself was made or manufactured therefrom.

The above statement in the majority opinion appears to be sound and fully supported by the authorities. It is my view, however, that the majority have fallen into error in finding and holding as follows:

It is clear from the record that the imported commodity, represented by exhibit 1, is nothing more or less than a cone of raw silk yarn. It had no preexistence as raw silk. It became raw silk or raw silk yarn in its very inception when reeled from cocoons. Hence, it follows that the article in controversy should be regarded, as a matter of law, not as a yarn *made from raw silk* but as a yarn *made from cocoons.*

I cannot agree that the involved merchandise is not a yarn made from raw silk but is a yarn made from cocoons. Cocoons and raw silk are different commodities. Cocoons are described and provided for in paragraph 1762, and raw silk, with certain limitations, is described and provided for in paragraph 1763 of the Tariff Act of 1930. Before the involved merchandise was removed from the cocoons, it was raw silk in the form of cocoons, and was such merchandise as is described and provided for in said paragraph 1762. The removal of the raw silk from the cocoons and placing it on a reel was a manufacturing process which converted the raw silk in cocoon form into an entirely different article, to wit, silk, raw, reeled. Silk, raw, reeled, was recognized by Congress, in enacting said paragraph 1763, as an entirely different article of commerce from raw silk in cocoon form. When silk, raw, reeled, was removed from the reel and placed on cones, exhibit 1, it underwent a further manufacturing process which the collector found converted it into a yarn.

Therefore, the material from which the involved yarn was made was not cocoons. The cocoons had already been destroyed and were nonexistent after the silk contained therein or thereon had been reeled therefrom. After the silk in cocoon form had been reeled on to the reel, it was no longer silk in cocoons, but silk, raw, reeled from the cocoon. It is my view, therefore, that the majority have erred in holding that the involved merchandise is a yarn "made from cocoons."

My views, as indicated above, would appear to be confirmed by the decision of the Supreme Court of the United States in the case of *Tide Water Oil Co.* v. *United States*, 171 U. S. 210, 43 L. ed. 139, from which the following is quoted:

The primary meaning of the word "manufacture" is something made by hand, as distinguished from a natural growth; but as machinery has largely supplanted this primitive method, the word is now ordinarily used to denote an article upon the material of which labor has been expended to make the finished product. Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.

The material of which each manufacture is formed, and to which reference is made in section 3019, is not necessarily the original raw material—in this case the tree or log—but the product of a prior manufacture; the finished product of one manufacture thus becoming the material of the next in rank.

When the sound pronouncements contained in the above quotation are applied to the facts in this case, their controlling effect is readily apparent.

There can be no question but that the material of which the cocoon is composed is raw silk, or that the winding of the silk, raw, from the cocoon on to the reel was a manufacturing process. The second manufacturing process was when the silk, raw, reeled, was wound from the reel on to the cone. No argument is necessary to show that the cocoon *per se* is not a yarn. Therefore, if, as held by the majority, "It became raw silk * * * yarn in its very inception when reeled from cocoons," it cannot be denied that the involved yarn was made from raw silk. Hence, it *does not* follow, as matter of law, that the article in controversy should be regarded, not as a yarn made from raw silk but as a yarn made from cocoons. This would seem to dispose of the holding of the majority that "It had no preexistence as raw silk."

In view of the fact that the majority rest their conclusion that the merchandise is not dutiable under paragraph 1204 of the Tariff Act of 1930, as classified by the collector, upon the premise that the involved yarns are not made from raw silk reeled from the cocoon, but that they are made from cocoons, and since I consider this conclusion to be erroneous under the *Tide Water Oil Co.* case, *supra*, and the *Veit* case, *supra*, a further discussion of this interesting subject is not deemed necessary. I therefore respectfully dissent.