(C. D. 1237)

TRIUMPH GLOVE CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided April 20, 1950)

*Jordan & Klingaman* (*Jacob L. Klingaman* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Howard L. Harawitz*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: At the conclusion of the plaintiff's case in the trial of these two protests counsel for the defendant moved to dismiss the same on the ground that the protests were not brought by the proper party plaintiff. The basis of such motion is stated as follows:

\* \* \* The entry papers, the official papers on file, including the owner's declaration, and the testimony of this witness [note—who identified himself as the president of the Triumph Glove Corporation], has [sic] indicated that the plaintiff is a domestic corporation organized under the laws of the State of New York, and has the name of Triumph Glove Corporation. The protest in each of these cases is signed in the name of Triumph Glove Company. I submit that the suffixes "corporation" and "company" represent different entities, and the protestant in the name of Triumph Glove Co. has no legal capacity to sue, because it is neither the importer, consignee or agent specified in paragraph or Section 514 of the Tariff Act \* \* \*.

Counsel for the plaintiff thereupon moved orally that the signature be amended to read "Corporation" instead of "Co.," and upon objec-

tion to the said motion by counsel for the defendant, decision on defendant's motion to dismiss and on plaintiff's motion to amend was taken under advisement.

Each of the protests is signed "Triumph Glove Co., By Jordan & Klingaman, Attorneys, 17 Battery Place, New York, N. Y." It appears from the entry papers and from the statements of plaintiff's witness Firth that the actual owner and ultimate consignee of the merchandise was the Triumph Glove Corporation of 404 Fourth Avenue, New York, N. Y. In the brief filed on behalf of the defendant counsel has cited section 9 of the New York General Corporation Law, relating to corporate names, and the case of *Central Films, Ltd.* v. *United States*, 3 Cust. Ct. 290, C. D. 257. While section 9 of the New York State General Corporation Law does refer to the legal distinctions between corporations, natural persons, firms, and co-partnerships, it is with reference to the incorporation or authorization of corporations to do business within that State, and has no reference to the validity of the acts or form of signature of corporations organized under the laws of that State.

The *Central Films, Ltd.*, case likewise has no application to the situation in the case at bar since it appeared in that case that the plaintiff, who had protested against a claimed illegal exaction of certain money as liquidated damages for failure to export merchandise under customs supervision under the provisions of section 308 (1) of the Tariff Act of 1930, had not in fact paid any charges or exactions. On the other hand, there is no question but that the party seeking to litigate the issues in the case at bar was the owner and consignee within the meaning of those terms as used in section 514 of the Tariff Act of 1930, and hence is a proper party plaintiff.

The situation is not that the Triumph Glove Co. was in fact or in law a separate and distinct entity from the Triumph Glove Corporation, but that the signing of the protests in the name of Triumph Glove Co. was an inaccuracy. That such an inaccuracy will not void a protest was held in the case of *M. de Orlando & Co.* v. *United States*, 38 Treas. Dec. 180, T. D. 38303, the situation in which was almost precisely on all fours with that in the case at bar and which was the subject of an exhaustive and well-written opinion by the late Judge Sullivan of this court.

The motion to dismiss the protests is therefore denied, and such action makes unnecessary disposition of the motion to amend.

The merchandise the subject of these protests is described on the invoices as "Ladies' glove tranks" and was classified by the collector

of customs as ladies' leather gloves, partly manufactured, unseamed, unlined, and untrimmed, and assessed with duty at the rate of 50 per centum ad valorem under the provisions of paragraph 1532 (a) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. §1001, par. 1532 (a)). The protest claim in each case is for classification of the merchandise as glove tranks with assessment of duty at 75 per centum of the assessed rate by virtue of the last proviso contained in paragraph 1532 (a), *supra*. Alternatively, it is contended by timely amendment that the merchandise is dutiable at the rate of 25 per centum ad valorem under the provision for manufactures of leather, not specially provided for, in paragraph 1531 of the Tariff Act of 1930, as amended by the British Trade Agreement, T. D. 49753. For convenience, the texts of paragraphs 1531 and 1532 (a), so far as pertinent, are set forth in the margin.[1]

The merchandise in issue, which is represented by collective exhibit 1, consists of several pieces of leather cut into such shapes that when fitted together they constitute all the parts of a woman's glove; that is to say, there is a main piece cut in the form of two outlines of a hand, exclusive of the thumb, both outlines being joined at the index fingers, and appearing as follows:

---

[1] PAR. 1531. * * * manufactures of leather, rawhide, or parchment, or of which leather, rawhide, or parchment is the component material of chief value, not specially provided for, 35 per centum ad valorem * * * . [Note—rate reduced to 25 per centum ad valorem by British Trade Agreement reported in T. D. 49753.]

PAR. 1532. (a) Gloves made wholly or in chief value of leather, whether wholly or partly manufactured, shall be dutiable at the following rates, the lengths stated in each case being the extreme length (including the unfolded length of cuffs or other appendages) when stretched to their fullest extent namely: * * * women's and children's gloves not over twelve inches in length, $5.50 per dozen pairs; for each inch or fraction thereof, in excess of twelve inches, 50 cents per dozen pairs: *Provided*, That, in addition thereto, on all the foregoing there shall be paid each of the following cumulative duties: When machine seamed, otherwise than overseamed, $1 per dozen pairs; when seamed by hand, $5 per dozen pairs; when lined with cotton, wool, silk, or other fabrics, $3.50 per dozen pairs; when trimmed with fur, $4 per dozen pairs; when lined with leather or fur, $5 per dozen pairs: *Provided further*, That all the foregoing shall be dutiable at not less than 50 per centum ad valorem: *Provided further*, That glove tranks, with or without the usual accompanying pieces, shall be subject to 75 per centum of the duty provided for the gloves in the fabrication of which they are suitable.

Wherever in this opinion the "main piece" is referred to, the above is meant. In addition, there are a thumb piece and pieces called "fourchettes," which fit in between the fingers when the glove is made.

One witness, Eric Firth, president of the plaintiff, testified in its behalf, and one witness testified on behalf of the defendant. Their

testimony on the main issue is flatly contradictory and irreconcilable. Plaintiff's witness, whose experience in the manufacture and sale of gloves in the United States dates from 1940, identified the main piece as a "slitted trank" and the thumb piece and fourchettes as "fittings."

Mr. Firth testified that there are three methods used in the manufacture of gloves. In the first method, called the "pattern cut," which he said was the one used in the making of the merchandise at bar, a piece of leather in the form, roughly, of the back of a large mitten is cut from the skin, the said piece being of a size to permit the ultimate cutting therefrom of the main piece above referred to. This mitten-like piece of leather, illustrated by illustrative exhibit A, a drawing made by the witness on paper, he identified as a "trank" or an "unslitted trank." A cardboard pattern having the outline of the above-mentioned main piece is placed on the trank and the trank is cut around the outline of the pattern, he said. This outline is then slit, presumably along the finger portions, and a hole for the thumb is cut, and the resulting piece is the main piece above referred to, which the witness denominated a "slitted trank."

In the second method, called the "block cut," the whole skin goes on a big block. A metal die in the shape of the main piece is placed on the skin and with a large hammer the cutter punches out the main piece in one operation.

In the third method, called the "table cut," a French ruler is used and instead of using a paper pattern or a die the measurements are made on the skin and the main piece is cut from the measurements so made.

The witness stated that the basic shape of the unslitted trank was the mitten shape illustrated by illustrative exhibit A, and that the trank or slitted trank was the shape of the main piece above referred to, which is part of collective exhibit 1.

Daniel Higier, a glove manufacturer of over 40 years' experience in the business, testified for the defendant. There was offered and received in evidence without objection as illustrative exhibit B a skin similar to the type that is used for cutting gloves. A pair of oblong or trapezoidal-shaped leather articles approximately 7½ inches wide by 9 inches long was received in evidence without objection as collective illustrative exhibit C as representing the result of the first cutting operation. These latter articles the witness identified as "tranks."

A cardboard pattern in the shape of the main piece hereinbefore referred to was received in evidence without objection as illustrative exhibit D. This, the witness said, was used in the process of fashioning the gloves by placing it on one of the tranks, collective illustrative exhibit C, and moistening, stretching, and working the trank until it

assumed the size and shape of the pattern. The result of this operation is represented by a pair of leather articles received in evidence without objection as collective illustrative exhibit E. These were in the oblong or trapezoidal shape but are longer and narrower than the tranks, collective illustrative exhibit C, being approximately 6 inches wide by 11 inches long, and the witness stated that at this stage they were no longer known as "tranks" in the leather glove industry but as an unslitted pair of gloves.

According to this witness, in the next step the unslitted pair of gloves represented by collective illustrative exhibit E goes to the slitting department, where three and four pairs are placed on a steel die at one time and by a process of stamping are stamped out in the shape of illustrative exhibit D, the cardboard pattern, and take the appearance of collective illustrative exhibit F, received in evidence without objection which appears to be the same as the main piece of collective exhibit 1. At this stage, the witness testified, they are known in the leather glove industry as a pair of unsewn gloves, and not as tranks.

In the brief filed on behalf of the plaintiff the following dictionary definitions are cited:

Webster's New International Dictionary (1923):

trank. An oblong piece of skin from which glove shapes are cut; also, a shape cut from it.

It should be noted that this same definition appears in the later editions of Webster's New International Dictionary, and that in each case a reference is made to the definition of the word "glove." In connection with the latter definition, an illustration is shown in the said dictionary of the various parts which go into the making of a glove, and item "2" in the said illustration appears to be substantially the same as the main piece above referred to found in collective exhibit 1 and in collective illustrative exhibit F, and the said item "2" is denominated under the illustration as a "trank."

Oxford Dictionary (1926):

trank. An oblong piece of kid or other skin from which a glove is to be cut out; also, a glove shape cut from this, before being sewn.

Opposed to these definitions are those found in the following:

Funk & Wagnalls New Standard Dictionary (1942):

trank. An oblong piece of skin from which the pieces that go to make up a glove are cut.

It should be noted that this same definition is found in earlier editions of the New Standard Dictionary and the Standard Dictionary as far back as 1900.

Century Dictionary & Cyclopedia (1913):

trank. In *glove-making*, an oblong piece taken from the skin, from which the shape of the glove is cut by a knife in a press.

The provision for glove tranks as it appears in the existing tariff act is the same as that which appeared in all preceding tariff acts as far back to and including that of 1894, so we are not necessarily limited to a consideration of its meaning at the time of the passage of the Tariff Act of 1930.

The provision for glove tranks received judicial interpretation in the case of *Poncet & Neeser* v. *United States*, 8 Treas. Dec. 750, T. D. 25858. There, merchandise which appears to have been in exactly the same condition as the merchandise at bar, being described as—

\* \* \* numerous pieces of lambskin, cut into such shapes that when fitted together they constitute all the parts of a lady's glove \* \* \*

was held to be gloves partly manufactured under the provision therefor in the Tariff Act of 1897, rather than under the provision for glove tranks in the same act. The case was never appealed, and stands as the only judicial authority the court has been able to find on the subject.

We are unable to come to a different conclusion on the record in the case at bar. The evidence offered by the plaintiff was, in our view, successfully rebutted by that offered by the defendant. The dictionary definitions show that lexicographers are not in agreement on the scope of the term "trank," and they fail to aid the court in the determination of the issue. The only judicial precedent is in favor of the classification made by the collector.

We are not impressed by the argument made by counsel for the plaintiff in the brief filed in its behalf that since partly manufactured gloves take the same rates as wholly manufactured gloves it would be impossible to determine the correct rate to apply to the articles at bar, as the record shows they are suitable for use in either hand-seamed or machine-seamed gloves. In the case of *United States* v. *Aris Gloves, Inc.*, 31 C. C. P. A. 169, C. A. D. 268, it was determined that gloves which had been neither machine-seamed nor seamed by hand were properly dutiable under the provisions of paragraph 1532 (a), as unmodified, i. e., without the cumulative duties imposed by the first proviso of that paragraph.

The protests are therefore overruled, and judgment will issue accordingly.