(C.D. 2223)

THE DIAMOND MATCH COMPANY *v.* UNITED STATES (WINTER, WOLFF & CO., INC., PARTY IN INTEREST)

## United States Customs Court, Third Division

(Decided December 8, 1960)

*Lamb & Lerch* (*David A. Golden* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.
*Sharretts, Paley & Carter* (*Howard Clare Carter* and *W. R. Johnson* of counsel) for the party in interest.

Before JOHNSON, RICHARDSON, and OLIVER, Judges

JOHNSON, Judge: The merchandise involved in this case consists of wooden spatulas or ice cream sticks, imported from Japan, in bundles of 50, held together by a paper band or strip, marked "Made in Japan." The individual sticks are not marked.

The protest herein has been brought by an American manufacturer of ice cream sticks pursuant to section 516(b) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938 (19 U.S.C. § 1516(b)), against the collector's liquidation without the assessment of an additional duty of 10 per centum ad valorem under section 304 of said tariff act, as amended (19 U.S.C. § 1304). It is claimed that the marking of the bands rather than the individual sticks does not apprise the ultimate purchaser of the country of origin, and that, therefore, the additional duty should have been assessed.

The pertinent provisions of the tariff act, as amended, are as follows:

SEC. 516. APPEAL OR PROTEST BY AMERICAN PRODUCERS.

\* \* \* \* \* \* \* \*

(b) CLASSIFICATION.—The Secretary of the Treasury shall, upon written request by an American manufacturer, producer, or wholesaler, furnish the classification of, and the rate of duty, if any, imposed upon, designated imported merchandise of a class or kind manufactured, produced, or sold at wholesale by him. If such manufacturer, producer, or wholesaler believes that the proper rate of duty is not being assessed, he may file a complaint with the Secretary, setting forth a description of the merchandise, the classification, and the rate or rates of duty he believes proper, and the reasons for his belief. If the Secretary decides that the classification of, or rate of duty assessed upon, the merchandise is not correct, he shall notify the collectors as to the proper classification and rate of duty and shall so inform the complainant, and such rate of duty shall be assessed upon all such merchandise entered for consumption or withdrawn from warehouse for consumption after thirty days after the date such notice to the collectors is published in the weekly Treasury Decisions. If the Secretary decides that the classification and rate of duty are correct, he shall so inform the complainant. If dissatisfied with the decision of the Secretary, the complainant may file with the Secretary, not later than thirty days after the date of such

decision, notice that he desires to protest the classification of, or rate of duty assessed upon, the merchandise. Upon receipt of such notice from the complainant, the Secretary shall cause publication to be made of his decision as to the proper classification and rate of duty and of the complainant's desire to protest, and shall thereafter furnish the complainant with such information as to the entries and consignees of such merchandise, entered after the publication of the decision of the Secretary at the port of entry designated by the complainant in his notice of desire to protest, as will enable the complainant to protest the classification of, or rate of duty imposed upon, such merchandise in the liquidation of such an entry at such port. The Secretary shall direct the collector at such port to notify such complainant immediately when the first of such entries is liquidated. Within thirty days after the date of mailing to the complainant of notice of such liquidation, the complainant may file with the collector at such port a protest in writing setting forth a description of the merchandise and the classification and rate of duty he believes proper. * * *

(c) HEARING AND DETERMINATION.—A copy of every appeal and every protest filed by an American manufacturer, producer, or wholesaler under the provisions of this section shall be mailed by the collector to the consignee or his agent within five days after the filing thereof, and such consignee or his agent shall have the right to appear and to be heard as a party in interest before the United States Customs Court. The collector shall transmit the entry and all papers and exhibits accompanying or connected therewith to the United States Customs Court for due assignment and determination of the proper value or of the proper classification and rate of duty. * * *

SEC. 304. MARKING OF IMPORTED ARTICLES AND CONTAINERS.

(a) MARKING OF ARTICLES.—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

*       *       *       *       *       *       *

(3) Authorize the exception of any article from the requirements of marking if—

*       *       *       *       *       *       *

(D) The marking of a container of such article will reasonably indicate the origin of such article;

*       *       *       *       *       *       *

(b) MARKING OF CONTAINERS.—Whenever an article is excepted under subdivision (3) of subsection (a) of this section from the requirements of marking, the immediate container, if any, of such article, or such other container or containers of such article as may be prescribed by the Secretary of the Treasury, shall be marked in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of such article, subject to all provisions of this section, including the same exceptions as are applicable to articles under subdivision (3) of subsection (a). * * *

(c) ADDITIONAL DUTIES FOR FAILURE TO MARK.—If at the time of importation any article (or its container, as provided in subsection (b) hereof) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b) hereof) marked after importation in accordance with the require-

ments of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. * * *

At the first hearing of this case, the issue was stated, certain exhibits were placed in evidence, and the party in interest made three motions to dismiss the protest. One of the motions was subsequently withdrawn, the other two denied, and the case restored to the docket for trial on the merits. *The Diamond Match Company* v. *United States (Winter, Wolff & Co., Inc., Party in Interest)*, 44 Cust. Ct. 67, C.D. 2154.

During the course of the trial, counsel for the party in interest renewed the motion previously withdrawn to dismiss the protest on the ground that it was signed by The Diamond Match Company in October 1958; that there was no such company in existence at that time; and that, therefore, the plaintiff was not a domestic manufacturer, producer, or wholesaler entitled to file a protest under section 516(b), *supra.*

Gerald Vaughan, general manager of the Maine mills of the plaintiff, testified at the trial that the match and woodenware portion of The Diamond Match Company became The Diamond Match Division of The Diamond Gardner Corporation in 1958, and it subsequently became The Diamond Match Division of The Diamond National Corporation. He said that this division manufactures items such as exhibit 13 and that it is part of the Diamond National organization.

The history of this proceeding shows that, pursuant to section 516(b), *supra*, on February 8, 1957, The Diamond Match Company addressed a letter to the Secretary of the Treasury requesting certain information as to the classification of the involved merchandise; that, on April 19, 1957, the Bureau of Customs replied to the request; that, on June 11, 1957, a complaint was filed by The Diamond Match Company with the Secretary of the Treasury; that a ruling was issued by the Bureau on September 4, 1957, as a result of which a notice of dissatisfaction, dated October 14, 1957, was sent to the Commissioner of Customs, indicating a desire by plaintiff to file a protest.

Roy E. Monaco, an attorney employed by Diamond National Corporation, testified that the name of The Diamond Match Company was changed to Diamond Gardner Corporation on November 4, 1957, and that the name Diamond Gardner Corporation was changed to Diamond National Corporation on September 28, 1959.

The protest involved herein was filed on October 20, 1958, in the name of The Diamond Match Company.

Mr. Monaco explained that the first change of name came about as the result of a purchase by The Diamond Match Company, a Delaware corporation, of the assets of the Gardner Board and Carton Company, an Ohio corporation, late in 1957, and pursuant to a plan of reorganization and agreement. The second change of name resulted from the purchase by Diamond Gardner Corporation of the stock and assets of United States Printing and Lithograph Company, and pursuant to a second plan of reorganization.

The witness testified that from the time that the entity was called The Diamond Match Company, until today when it is called Diamond National Corporation, it has been the same organization, having the same policies and manufacturing the same products. He said that there were some changes in the type of stock and that, pursuant to the two plans of reorganization, the merged corporations were both represented on the slate of officers and on the Board of Directors, but that the original officers and directors of The Diamond Match Company remained throughout. No new corporation was formed involving The Diamond Match Company; it was the same corporation under a new name. No new charters were secured, but the changes were made by amendments to the original certificate of incorporation.

A copy of a certificate of change of name, filed pursuant to the General Corporation Law of the State of New York, received in evidence as party in interest's exhibit C, states that the corporation received authority to do business in New York on March 31, 1936; that the name relinquished was The Diamond Match Company; that the name assumed was Diamond Gardner Corporation; and that the change of name was made in accordance with the laws of Delaware.

It is clear from this evidence that the corporation known as The Diamond Match Company never ceased to exist but that its name was changed by amendments to its certificate of incorporation, first to Diamond Gardner Corporation and then to Diamond National Corporation. A change in the name of a corporation has no effect upon its identity. (13 Am. Juris., Corporations, sec. 141; 18 C.J.S., Corporations, sec. 171(f)(1).)

Since at the time the protest was filed, the correct name of the corporation was Diamond Gardner Corporation, that name should have appeared thereon, with an indication that it was formerly known as The Diamond Match Company. It has been held, however, that the signing of a protest with an incorrect name is an inaccuracy which will not invalidate it. *Triumph Glove Co.* v. *United States*, 24 Cust. Ct. 221, C.D. 1237. In that case, the court said (p. 222):

The situation is not that the Triumph Glove Co. was in fact or in law a separate and distinct entity from the Triumph Glove Corporation, but that the signing of the protests in the name of Triumph Glove Co. was an inaccuracy. That such an inaccuracy will not void a protest was held in the case of *M. de*

*Orlando & Co.* v. *United States*, 38 Treas. Dec. 180, T.D. 38303, the situation in which was almost precisely on all fours with that in the case at bar and which was the subject of an exhaustive and well-written opinion by the late Judge Sullivan of this court.

It has been established that at the time the steps prerequisite to the filing of this protest pursuant to section 516(b), *supra*, were commenced, The Diamond Match Company was the manufacturer of merchandise of the class or kind of the imported merchandise. The same corporation, although having a different name, is still manufacturing such merchandise. This is not a case where the real party in interest is not disclosed, as in *The Manufacturers and Producers of Goat, Sheep and Cabretta Leathers, etc.* v. *United States, American Express Co., Pellis, Inc., and Leather Trading Corp., Parties in Interest*, 21 C.C.P.A. (Customs) 591, T.D. 46996. The real party in interest here is the corporation which was at one time known as The Diamond Match Company, has been called Diamond Gardner Corporation, and is now known as Diamond National Corporation. The inaccuracy of the name used in the protest was not such as to fail to disclose the real party in interest or to mislead the importer or the Government.

Under the circumstances of this case, we find that the failure to use the correct name of the corporation in the protest does not invalidate it. The motion to dismiss is, therefore, denied.

At the original hearing, there was received in evidence a sample of the imported merchandise (plaintiff's exhibit 11), consisting of a bundle of round-end wooden sticks, 4½ inches long, three-eighths of 1 inch wide, and one-twelfth of 1 inch thick, enclosed loosely in a paper band, 1½ inches wide, marked "Made in Japan." At the second hearing, additional samples representative of the imported merchandise were received in evidence as plaintiff's collective exhibit 11-A. They consist of bundles of 50 such sticks, arranged flat face to flat face, and enclosed tightly in a paper band, marked "Made in Japan."

During the course of the trial, it was conceded that the merchandise as imported was in the condition of plaintiff's collective exhibit 11-A and was ready for insertion in ice cream manufacturing machines.

Mr. Vaughan testified that the plaintiff corporation manufactures flat wooden items such as the imported merchandise and sells them to ice cream manufacturers and other customers. A sample of plaintiff's product was received in evidence as plaintiff's exhibit 13. It consists of a bundle of 50 wooden sticks of the same size and packaged in the same manner (except for the marking on the band) as plaintiff's collective exhibit 11-A. The witness stated that he had seen such sticks used in the manufacture of ice cream confections and described the process as follows: The bundles of sticks are placed in the manufacturing machine and the sticks are forced into holders into which

they are clamped. The holders are then passed over a container with a number of pockets which are filled with a liquid or semiliquid confection. Approximately an inch and a quarter of each stick is then inserted into the confection, and the whole unit passes through a freezing apparatus. When the confection is completely frozen, the stick is firmly attached to the confection. As the unit comes out of the freezing apparatus, an injection of heat or steam is given to the outside of the containers so that the confection can be removed. Then, the sticks with the confection attached are lifted out of the containers and either dropped in mass or in such manner that each stick and confection falls into a glassine bag. The sticks themselves are not washed, steamed, polished, or treated during the course of the operation. According to the witness, the primary use of the stick is as a handle with which the frozen confection may be eaten by the eventual purchaser thereof.

Mr. Vaughan testified that 14 per centum of his company's production of wooden sticks was sold to customers other than ice cream manufacturers but that 90 per centum of that amount was packed in bulk or in cartons, rather than packaged as plaintiff's exhibit 13. He had seen the wooden sticks used for coffee stirring, in arts and crafts, and as a small tongue depressor in children's wards of hospitals. In arts and crafts, he had seen them used to make novelty articles, such as fruit bowls, wellhouse covers, ladders, and small toy beds. He mentioned one instance in which he had seen banded sticks placed in a dispenser after the band was broken and had seen the sticks used for coffee stirring.

The witness stated that such sticks can be branded without injury. A sample of branded sticks was received in evidence as plaintiff's illustrative exhibit 14. It consists of wooden sticks into which are branded words, such as "Humorette," "Try our Special," or "Good Humor." According to the witness, about 18 per centum of the company's production consists of branded sticks.

Donald C. Templet, sales manager of Hardwood Products Co., testified that his company manufactures wooden items and produced a sample, which was received in evidence as plaintiff's exhibit 15. It consists of wooden sticks of the same size and packaging as plaintiff's exhibit 13. The witness stated that he personally sold such items for his company and had seen them used at ice cream plants in various parts of the country at least once or twice a year for 12 years. He had also seen individual sticks used for stirring coffee, in hobby kits, and as muddlers or drink stirrers in cocktail lounges and bars. In his experience, the chief use of plaintiff's exhibit 15, the banded wooden sticks, is by manufacturers of frozen confections. Pricelists covering wooden sticks manufactured by Hardwood Products

Co. were received in evidence as plaintiff's exhibit 16 and party in interest's exhibit D. It appears therefrom that the prices of such sticks in bulk or in cartons of 1,000, 10 cartons per case, were less than their price when packed 50 per bundle, secured by a paper band.

Paul Weiler, called as a witness by the party in interest, testified that he is manager of the New York Branch of American Handicrafts Co., distributor of handicraft materials. In the course of his duties, he has purchased imported and domestic merchandise like plaintiff's collective exhibit 11–A and has sold it in packages of 100, 1,000, or a full case, without breaking the bands around the bundles of 50 sticks. His firm sells kits which contain wooden sticks, but the witness did not know whether they were loose or banded.

Allen E. Shore, general manager of Mulco Products, Inc., testified that Winter, Wolff & Co., Inc., the party in interest, owns the majority of stock in Mulco Products and, at the time the protest herein was filed, handled imports for that company. He stated that he had sold merchandise like plaintiff's collective exhibit 11–A directly and had made calls with salesmen selling the product. Of the total sales of this product, he said, 99½ per centum is sold to ice cream manufacturers and about one-half of 1 per centum to customers in the craft field. The witness said he has visited 50 to 100 frozen confection plants a year in at least 40 States. He described the use of the sticks in ice cream making machines and pointed out:

Prior to the advent of banded ice cream sticks bulk sticks used to be supplied to the ice cream manufacturer, but the labor time involved in the woman reaching into the case and taking the sticks out and lining the sticks out so that she could put them in the automatic machine took too long, so the ice cream manufacturer actually pays a premium for banded sticks over bulk sticks in order to enable him to have these sticks lined up and put them in the channels.

The witness stated further that after the freezing and thawing processes and the withdrawal of the product from the mold, it is sometimes dipped in chocolate or processed in other ways. He noted also that if the sticks were loose or did not hold the ice cream, the product would be completely wasted; that the product, ice cream-on-a-stick or Popsicle ice, could not exist unless the stick were attached. The witness stated that the freezing operation raises the pores of the stick, so that it is no longer smooth and that sometimes ice crystals appear on the stick after the confection has been taken off. In the operations he observed, the sticks themselves were not washed, cleaned, sterilized, or processed prior to their use. He stated, however, that in order to give certification to ice cream manufacturers that the sticks conformed to the food additive law, his firm was required to and did submit samples to the Food and Drug Administration and received a clearance for them.

Mr. Shore testified that while his firm sells only 1 per centum of its banded ice cream sticks to handicraft people, a large quantity of the sticks in bulk, or packaged 1,000 to the box, is sold to such customers. The banded type is used in kits to avoid the time and labor necessary to count out a number of sticks, but for school, church, or Scout projects, bulk sticks are usually bought.

Section 304(a), *supra*, provides that every article of foreign origin imported into the United States shall be marked so as to indicate to the ultimate purchaser in the United States the name of the country of origin. An exception may be made by regulation if the marking of the container of such article will reasonably indicate the origin of the article. Section 11.10 of the Customs Regulations provides:

11.10 Exceptions to marking requirements.—(a) Articles within any specification in section 304(a)(3), Tariff Act of 1930. as amended, are hereby excepted from the requirement of marking. The marking of the container of an article will reasonably indicate the origin of such article within the meaning of section 304(a)(3)(D) if the article is imported * * * in a container which will reach the ultimate purchaser in the United States unopened. * * *

Plaintiff claims, and it is not disputed, that the individual sticks, and not the bundles of 50, are the imported articles in this case. The party in interest contends, however, that the articles are excepted from the marking requirements because the marking on the bands in which they were contained would reasonably indicate their origin to the ultimate purchaser.

It is obvious, of course, that the exception which has been allowed to this merchandise could not properly apply to wooden sticks imported loose or in unmarked containers or in containers which would not reach the ultimate purchaser unopened.

The record in this case indicates, and plaintiff concedes, that the articles in their condition as imported are used primarily by ice cream manufacturers who insert the sticks into frozen confectionery. There is also evidence that a small percentage of such merchandise is sold to others, mainly customers in the arts and crafts field, but, in those instances, the merchandise reaches the ultimate user directly or in kits, without the bands having been broken. Therefore, the sales to such customers are not material to the issue presented.

The question narrows down to whether the ice cream manufacturer or the purchaser of ice cream-on-a-stick is the ultimate purchaser of the sticks, within the meaning of the statute and the regulations issued thereunder.

The leading case on this subject is *United States* v. *Gibson-Thomsen Co., Inc.*, 27 C.C.P.A. (Customs) 267, C.A.D. 98, which involved wood brush blocks and toothbrush handles with the word "Japan" die-sunk on that part of the articles where, after importation, bristles were to be inserted, in order to convert the merchandise into hair-

brushes and toothbrushes, respectively. The Government there contended that imported material which was to be used in the United States in the manufacture of a new article should be marked so as to indicate to the retail purchaser of the new article the name of the country of origin of the imported material. The court held, however (p. 273):

We find nothing in the statute nor in its legislative history to warrant a holding that the Congress intended to require that an imported article, which is to be used in the United States as material in the manufacture of a new article having a new name, character, and use, and which, when so used, becomes an integral part of the new article, be so marked as to indicate to the retail purchaser of the new article that such imported article or material was produced in a foreign country. On the contrary, we are of opinion that the Congress intended, by the provisions of section 304(a)(2), *supra*, to cover only such imported articles as do not lose their identity as such when *combined* with other articles. [Italics quoted.]

Likewise, it was held in *United States* v. *Strauss Import Corp.*, 27 C.C.P.A. (Customs) 274, C.A.D. 99, that slide fasteners used primarily as material in articles manufactured in the United States need not be marked so that the name of the country of origin would not be obscured in the manufacturing operation.

Following these cases, it was held, in *M. Grumbacher* v. *United States*, 4 Cust. Ct. 340, C.D. 357, that brush handles marked in such manner that the printing would be hidden after ferrules were attached were legally marked so as to indicate to the ultimate purchaser—the brush manufacturer—the name of the country of origin.

A recent case, *Grafton Spools, Ltd.* v. *United States*, 45 Cust. Ct. 16, C.D. 2190, involved empty spools for ribbons for business machines, which were not marked but which were imported in cases which were clearly marked to show the country of origin. According to the record, the spools in the original cases are delivered to the manufacturers of business machines or manufacturers of ribbons for use in such machines; the manufacturers of such machines incorporate at least one empty spool and one spool with a ribbon into each machine; and the ribbon manufacturer winds ribbon on the empty spools. The Government claimed that the user of the business machine was the ultimate purchaser. The court pointed out, however, that the statute does not refer to the ultimate user, but to the ultimate purchaser; that the empty spools as such are not the articles of commerce in the United States; and that the spools become an integral part of the business machines. It was, therefore, held that the manufacturers of the machines and the manufacturers of the ribbons are the ultimate purchasers of the imported article of commerce, the empty spools.

Plaintiff seeks to distinguish these cases on the ground that the sticks involved herein are not mere raw materials but are end products

and that the combination of a stick with an ice cream confection does not result in a new article, having a new name, character, and use.

It is true that the sticks involved herein are completed articles in themselves, but it is also true that a product of one manufacturing operation may be used as material in a successive manufacturing process. *Tide Water Oil Company* v. *United States*, 171 U.S. 210; *American Import Co.* v. *United States*, 26 C.C.P.A. (Customs) 72, T.D. 49612.

In the instant case, more is done than merely combining sticks with ice cream by inserting them therein. According to the record, after the sticks are inserted in the soft or liquid ice cream mixture, the whole unit is frozen so that the stick is firmly set into the mixture, and cannot be removed without destroying the product. Thus, the stick forms an integral part of the product without which it could not function as ice cream-on-a-stick. This is a new product, having a new name, character, and use.

The sticks are not the articles of commerce purchased by the ultimate consumer any more than the spools were in the *Grafton* case or the brush handles and blocks in the *Gibson-Thomsen* case. The product purchased by the consumer is ice cream-on-a-stick. The ultimate purchaser of the sticks *per se* is the ice cream manufacturer.

We hold, therefore, that the merchandise involved herein, wooden spatulas or ice cream sticks, imported in bundles of 50, enclosed in a paper band or strip, marked "Made in Japan," was marked in accordance with section 304 (a) and (b) of the Tariff Act of 1930, as amended, *supra*, and the regulations issued thereunder, since the marking of the container would reasonably indicate the origin of such article to the ultimate purchaser thereof.

The protest is overruled. Judgment will be rendered accordingly.